(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAVIS *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 09–11328.   Argued March 21, 2011—Decided June 16, 2011

While conducting a routine vehicle stop, police arrested petitioner Willie Davis, a passenger, for giving a false name. After handcuffing Davis and securing the scene, the police searched the vehicle and found Davis's revolver. Davis was then indicted on charges of being a felon in possession of a firearm. In a suppression motion, Davis acknowledged that the search of the vehicle complied with existing Eleventh Circuit precedent interpreting *New York* v. *Belton*, 453 U. S. 454, but Davis raised a Fourth Amendment challenge to preserve the issue on appeal. The District Court denied the motion, and Davis was convicted. While his appeal was pending, this Court announced, in *Arizona* v. *Gant*, 556 U. S. ___, ___, a new rule governing automobile searches incident to arrests of recent occupants. The Eleventh Circuit held, under *Gant*, that the vehicle search at issue violated Davis's Fourth Amendment rights, but the court declined to suppress the revolver and affirmed Davis's conviction.

*Held:* Searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule. Pp. 6–20.

(a) The exclusionary rule's sole purpose is to deter future Fourth Amendment violations, *e.g.*, *Herring* v. *United States*, 555 U. S. 135, 141, and its operation is limited to situations in which this purpose is "thought most efficaciously served," *United States* v. *Calandra*, 414 U. S. 338, 348. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh the rule's heavy costs. Under a line of cases beginning with *United States* v. *Leon,* 468 U. S. 897, the result of this cost-benefit analysis turns on the "flagrancy of the police misconduct" at issue. *Id.*, at 909, 911. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth

Amendment rights, the benefits of exclusion tend to outweigh the costs. *Herring, supra*, at 144. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrent value of suppression is diminished, and exclusion cannot "pay its way." See *Leon*, *supra,* at 909, 919, 908, n. 6; *Herring*, *supra*, at 137. Pp. 6–9.

(b) Although the search in this case turned out to be unconstitutional under *Gant*, Davis concedes that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. Under this Court's exclusionary-rule precedents, the acknowledged absence of police culpability dooms Davis's claim. Pp. 9–11.

(c) The Court is not persuaded by arguments that other considerations should prevent the good-faith exception from applying in this case. Pp. 11–19.

(1) The argument that the availability of the exclusionary rule to enforce new Fourth Amendment precedent is a retroactivity issue, not a good-faith issue, is unpersuasive. This argument erroneously conflates retroactivity with remedy. Because Davis's conviction had not become final when *Gant* was announced, *Gant* applies retroactively in this case, and Davis may invoke its newly announced rule as a basis for seeking relief. See *Griffith* v. *Kentucky*, 479 U. S. 314, 326, 328. But retroactive application of a new rule does not determine the question of what remedy the defendant should obtain. See *Powell* v. *Nevada*, 511 U. S. 79, 83, 84. The remedy of exclusion does not automatically follow from a Fourth Amendment violation, see *Arizona* v. *Evans*, 514 U. S. 1, 13, and applies only where its "purpose is effectively advanced," *Illinois* v. *Krull*, 480 U. S. 340, 347. The application of the good-faith exception here neither contravenes *Griffith* nor denies retroactive effect to *Gant*. Pp. 12–16.

(2) Nor is the Court persuaded by the argument that applying the good-faith exception to searches conducted in reliance on binding precedent will stunt the development of Fourth Amendment law by discouraging criminal defendants from attacking precedent. Facilitating the overruling of precedent has never been a relevant consideration in this Court's exclusionary-rule cases. In any event, applying the good-faith exception in this context will not prevent this Court's review of Fourth Amendment precedents. If precedent from a federal court of appeals or state court of last resort upholds a particular type of search or seizure, defendants in jurisdictions where the question remains open will still have an undiminished incentive to litigate the issue, and this Court can grant certiorari in one of those cases. Davis's claim that *this* Court's Fourth Amendment precedents

Syllabus

will be effectively insulated from challenge is overstated. In many cases, defendants will test this Court's Fourth Amendment precedents by arguing that they are distinguishable. And at most, this argument might suggest that, in a future case, the Court could allow a petitioner who secures a decision overruling one of this Court's precedents to obtain suppression of evidence in that one case. Pp. 16–19.

598 F. 3d 1259, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, and KAGAN, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in the judgment. BREYER, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 09–11328

### WILLIE GENE DAVIS, PETITIONER *v.* UNITED STATES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2011]

JUSTICE ALITO delivered the opinion of the Court.

The Fourth Amendment protects the right to be free from "unreasonable searches and seizures," but it is silent about how this right is to be enforced. To supplement the bare text, this Court created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation. The question here is whether to apply this sanction when the police conduct a search in compliance with binding precedent that is later overruled. Because suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, we hold that searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.

I

The question presented arises in this case as a result of a shift in our Fourth Amendment jurisprudence on searches of automobiles incident to arrests of recent occupants.

### A

Under this Court's decision in *Chimel* v. *California*, 395 U. S. 752 (1969), a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area "within his immediate control." *Id.*, at 763 (internal quotation marks omitted). This rule "may be stated clearly enough," but in the early going after *Chimel* it proved difficult to apply, particularly in cases that involved searches "inside [of] automobile[s] after the arrestees [we]re no longer in [them]." See *New York* v. *Belton*, 453 U. S. 454, 458–459 (1981). A number of courts upheld the constitutionality of vehicle searches that were "substantially contemporaneous" with occupants' arrests.[1] Other courts disapproved of automobile searches incident to arrests, at least absent some continuing threat that the arrestee might gain access to the vehicle and "destroy evidence or grab a weapon."[2] In *New York* v. *Belton,* this Court granted certiorari to resolve the conflict. See *id.*, at 459–460.

In *Belton*, a police officer conducting a traffic stop lawfully arrested four occupants of a vehicle and ordered the arrestees to line up, un-handcuffed, along the side of the thruway. *Id.*, at 456; see Brief for Petitioner in *New York* v. *Belton*, O. T. 1980, No. 80–328, p. 3. The officer then searched the vehicle's passenger compartment and found cocaine inside a jacket that lay on the backseat. *Belton*, 453 U. S., at 456. This Court upheld the search as reasonable incident to the occupants' arrests. In an opinion that repeatedly stressed the need for a "straightforward,"

---

[1] See *e.g.*, *United States* v. *Sanders*, 631 F. 2d 1309, 1313–1314 (CA8 1980); *United States* v. *Dixon*, 558 F. 2d 919, 922 (CA9 1977); *United States* v. *Frick*, 490 F. 2d 666, 668–669 (CA5 1973); *Hinkel* v. *Anchorage*, 618 P. 2d 1069, 1069–1071 (Alaska 1980).

[2] See *e.g.*, *United States* v. *Benson*, 631 F. 2d 1336, 1340 (CA8 1980); see also *United States* v. *Rigales*, 630 F. 2d 364, 366–367 (CA5 1980); *Ulesky* v. *State*, 379 So. 2d 121, 125–126 (Fla. App. 1979).

"workable rule" to guide police conduct, the Court announced "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.*, at 459–460 (footnote omitted).

For years, *Belton* was widely understood to have set down a simple, bright-line rule. Numerous courts read the decision to authorize automobile searches incident to arrests of recent occupants, regardless of whether the arrestee in any particular case was within reaching distance of the vehicle at the time of the search. See *Thornton* v. *United States*, 541 U. S. 615, 628 (2004) (SCALIA, J., concurring in judgment) (collecting cases). Even after the arrestee had stepped out of the vehicle and had been subdued by police, the prevailing understanding was that *Belton* still authorized a substantially contemporaneous search of the automobile's passenger compartment.[3]

Not every court, however, agreed with this reading of *Belton*. In *State* v. *Gant*, 216 Ariz. 1, 162 P. 3d 640 (2007), the Arizona Supreme Court considered an automobile search conducted after the vehicle's occupant had been arrested, handcuffed, and locked in a patrol car. The court distinguished *Belton* as a case in which "four unsecured" arrestees "presented an immediate risk of loss of evidence and an obvious threat to [a] lone officer's safety." 216 Ariz., at 4, 162 P. 3d, at 643. The court held that where no such "exigencies exis[t]"—where the arrestee has been subdued and the scene secured—the rule of *Belton* does not apply. 216 Ariz., at 4, 162 P. 3d, at 643.

This Court granted certiorari in *Gant*, see 552 U. S.

---

[3] See, *e.g.*, *United States* v. *Dorsey*, 418 F. 3d 1038, 1041, 1043–1044 (CA9 2005) (upholding automobile search conducted after the officer had "handcuffed [the arrestee] and put him in the back of [the] patrol car"); *United States* v. *Barnes*, 374 F. 3d 601, 604 (CA8 2004) (same).

1230 (2008), and affirmed in a 5-to-4 decision. *Arizona* v. *Gant*, 556 U. S. ___ (2009). Four of the Justices in the majority agreed with the Arizona Supreme Court that *Belton*'s holding applies only where "the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." 556 U. S., at ___ (slip op., at 10). The four dissenting Justices, by contrast, understood *Belton* to have explicitly adopted the simple, bright-line rule stated in the *Belton* Court's opinion. 556 U. S., at ___ (opinion of ALITO, J.) (slip op., at 3); see *Belton*, 453 U. S., at 460 ("[W]e hold that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" (footnote omitted)). To limit *Belton* to cases involving unsecured arrestees, the dissenters thought, was to overrule the decision's clear holding. *Gant*, *supra*, at ___ (slip op., at 2–3). JUSTICE SCALIA, who provided the fifth vote to affirm in *Gant*, agreed with the dissenters' understanding of *Belton*'s holding. 556 U. S., at ___ (slip op., at 1–2) (concurring opinion). JUSTICE SCALIA favored a more explicit and complete overruling of *Belton*, but he joined what became the majority opinion to avoid "a 4-to-1-to-4" disposition. 556 U. S., at ___ (slip op., at 2–4). As a result, the Court adopted a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains "evidence relevant to the crime of arrest." *Id.*, at ___ (slip op., at 9–10) (citing *Thornton*, *supra*, at 632 (SCALIA, J., concurring in judgment); internal quotation marks omitted).

B

The search at issue in this case took place a full two years before this Court announced its new rule in *Gant*.

On an April evening in 2007, police officers in Greenville, Alabama, conducted a routine traffic stop that eventually resulted in the arrests of driver Stella Owens (for driving while intoxicated) and passenger Willie Davis (for giving a false name to police). The police handcuffed both Owens and Davis, and they placed the arrestees in the back of separate patrol cars. The police then searched the passenger compartment of Owens's vehicle and found a revolver inside Davis's jacket pocket.

Davis was indicted in the Middle District of Alabama on one count of possession of a firearm by a convicted felon. See 18 U. S. C. §922(g)(1). In his motion to suppress the revolver, Davis acknowledged that the officers' search fully complied with "existing Eleventh Circuit precedent." App. 13–15. Like most courts, the Eleventh Circuit had long read *Belton* to establish a bright-line rule authorizing substantially contemporaneous vehicle searches incident to arrests of recent occupants. See *United States* v. *Gonzalez*, 71 F. 3d 819, 822, 824–827 (CA11 1996) (upholding automobile search conducted after the defendant had been "pulled from the vehicle, handcuffed, laid on the ground, and placed under arrest"). Davis recognized that the District Court was obligated to follow this precedent, but he raised a Fourth Amendment challenge to preserve "the issue for review" on appeal. App. 15. The District Court denied the motion, and Davis was convicted on the firearms charge.

While Davis's appeal was pending, this Court decided *Gant*. The Eleventh Circuit, in the opinion below, applied *Gant*'s new rule and held that the vehicle search incident to Davis's arrest "violated [his] Fourth Amendment rights." 598 F. 3d 1259, 1263 (CA11 2010). As for whether this constitutional violation warranted suppression, the Eleventh Circuit viewed that as a separate issue that turned on "the potential of exclusion to deter wrongful police conduct." *Id.*, at 1265 (quoting *Herring* v. *United*

*States*, 555 U. S. 135, 137 (2009); internal quotation marks omitted). The court concluded that "penalizing the [arresting] officer" for following binding appellate precedent would do nothing to "dete[r] . . . Fourth Amendment violations." 598 F. 3d, at 1265–1266 (bracketing and internal quotation marks omitted). It therefore declined to apply the exclusionary rule and affirmed Davis's conviction. We granted certiorari. 562 U. S. ___ (2010).

## II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a "prudential" doctrine, *Pennsylvania Bd. of Probation and Parole* v. *Scott*, 524 U. S. 357, 363 (1998), created by this Court to "compel respect for the constitutional guaranty." *Elkins* v. *United States*, 364 U. S. 206, 217 (1960); see *Weeks* v. *United States*, 232 U. S. 383 (1914); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. *Stone* v. *Powell*, 428 U. S. 465, 486 (1976); see *United States* v. *Janis*, 428 U. S. 433, 454, n. 29 (1976) (exclusionary rule "unsupportable as reparation or compensatory dispensation to the injured criminal" (internal quotation marks omitted)). The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. *E.g.*, *Herring*, *supra,* at 141, and n. 2; *United States* v. *Leon*, 468 U. S. 897, 909, 921, n. 22 (1984); *Elkins*, *supra*, at 217 ("calculated to prevent, not to repair"). Our cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served." *United States* v. *Calandra*, 414 U. S. 338, 348 (1974). Where suppression fails to yield "appreciable

deterrence," exclusion is "clearly . . . unwarranted." *Janis*, *supra*, at 454.

Real deterrent value is a "necessary condition for exclusion," but it is not "a sufficient" one. *Hudson* v. *Michigan*, 547 U. S. 586, 596 (2006). The analysis must also account for the "substantial social costs" generated by the rule. *Leon*, *supra,* at 907. Exclusion exacts a heavy toll on both the judicial system and society at large. *Stone*, 428 U. S., at 490–491. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. *Ibid.* And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. See *Herring*, *supra*, at 141. Our cases hold that society must swallow this bitter pill when necessary, but only as a "last resort." *Hudson*, *supra,* at 591. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. See *Herring, supra*, at 141; *Leon*, *supra*, at 910.

Admittedly, there was a time when our exclusionary-rule cases were not nearly so discriminating in their approach to the doctrine. "Expansive dicta" in several decisions, see *Hudson*, *supra*, at 591, suggested that the rule was a self-executing mandate implicit in the Fourth Amendment itself. See *Olmstead* v. *United States*, 277 U. S. 438, 462 (1928) (remarking on the "striking outcome of the *Weeks* case" that "the Fourth Amendment, although not referring to or limiting the use of evidence in courts, really forbade its introduction"); *Mapp*, *supra,* at 655 ("[A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). As late as our 1971 decision in *Whiteley* v. *Warden, Wyo. State Penitentiary,* 401 U. S. 560, 568–569, the Court "treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule." *Arizona* v. *Evans*, 514 U. S. 1, 13 (1995). In time, however, we came to acknowledge the

exclusionary rule for what it undoubtedly is—a "judicially created remedy" of this Court's own making. *Calandra, supra,* at 348. We abandoned the old, "reflexive" application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits. *Evans, supra*, at 13; see, *e.g.*, *Calandra, supra; Janis, supra; Stone, supra; INS* v. *Lopez-Mendoza*, 468 U. S. 1032 (1984); *United States* v. *Havens*, 446 U. S. 620 (1980). In a line of cases beginning with *United States* v. *Leon,* 468 U. S. 897, we also recalibrated our cost-benefit analysis in exclusion cases to focus the inquiry on the "flagrancy of the police misconduct" at issue. *Id.*, at 909, 911.

The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. *Herring*, 555 U. S., at 143. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id.,* at 144. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, *Leon, supra*, at 909 (internal quotation marks omitted), or when their conduct involves only simple, "isolated" negligence, *Herring, supra*, at 137, the "'deterrence rationale loses much of its force,'" and exclusion cannot "pay its way." See *Leon, supra*, at 919, 908, n. 6 (quoting *United States* v. *Peltier*, 422 U. S. 531, 539 (1975)).

The Court has over time applied this "good-faith" exception across a range of cases. *Leon* itself, for example, held that the exclusionary rule does not apply when the police conduct a search in "objectively reasonable reliance" on a warrant later held invalid. 468 U. S., at 922. The error in such a case rests with the issuing magistrate, not the police officer, and "punish[ing] the errors of judges" is not the office of the exclusionary rule. *Id.*, at 916; see also *Massachusetts* v. *Sheppard*, 468 U. S. 981, 990 (1984)

(companion case declining to apply exclusionary rule where warrant held invalid as a result of judge's clerical error).

Other good-faith cases have sounded a similar theme. *Illinois* v. *Krull*, 480 U. S. 340 (1987), extended the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes. *Id.*, at 349–350 ("legislators, like judicial officers, are not the focus of the rule"). In *Arizona* v. *Evans*, *supra*, the Court applied the good-faith exception in a case where the police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees. *Id.*, at 14. Most recently, in *Herring* v. *United States*, 555 U. S. 135, we extended *Evans* in a case where *police* employees erred in maintaining records in a warrant database. "[I]solated," "nonrecurring" police negligence, we determined, lacks the culpability required to justify the harsh sanction of exclusion. 555 U. S., at 137, 144.

## III

The question in this case is whether to apply the exclusionary rule when the police conduct a search in objectively reasonable reliance on binding judicial precedent. At the time of the search at issue here, we had not yet decided *Arizona* v. *Gant*, 556 U. S. ___, and the Eleventh Circuit had interpreted our decision in *New York* v. *Belton*, 453 U. S. 454, to establish a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. *Gonzalez*, 71 F. 3d, at 825. The search incident to Davis's arrest in this case followed the Eleventh Circuit's *Gonzalez* precedent to the letter. Although the search turned out to be unconstitutional under *Gant*, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way. See Brief for Petitioner 49 ("sup-

pression" in this case would "impl[y] no assignment of blame").

Under our exclusionary-rule precedents, this acknowledged absence of police culpability dooms Davis's claim. Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield "meaningfu[l]" deterrence, and culpable enough to be "worth the price paid by the justice system." *Herring*, 555 U. S., at 144. The conduct of the officers here was neither of these things. The officers who conducted the search did not violate Davis's Fourth Amendment rights deliberately, recklessly, or with gross negligence. *See ibid.* Nor does this case involve any "recurring or systemic negligence" on the part of law enforcement. *Ibid.* The police acted in strict compliance with binding precedent, and their behavior was not wrongful. Unless the exclusionary rule is to become a strict-liability regime, it can have no application in this case.

Indeed, in 27 years of practice under *Leon*'s good-faith exception, we have "never applied" the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct. *Herring*, *supra*, at 144. If the police in this case had reasonably relied on a warrant in conducting their search, see *Leon*, *supra*, or on an erroneous warrant record in a government database, *Herring*, *supra*, the exclusionary rule would not apply. And if Congress or the Alabama Legislature had enacted a statute codifying the precise holding of the Eleventh Circuit's decision in *Gonzalez*,[4] we would swiftly conclude that

———————

[4] Cf. Kan. Stat. Ann. §22–2501(c) (2007) ("When a lawful arrest is effected a law enforcement officer may reasonably search the person arrested and the area within such person's immediate presence for the purpose of . . . [d]iscovering the fruits, instrumentalities, or evidence of a crime"). The Kansas Supreme Court recently struck this provision down in light of *Arizona* v. *Gant*, 556 U. S. ___ (2009). *State* v. *Henning*, 289 Kan. 136, 137, 209 P. 3d 711, 714 (2009). But it has applied

"'[p]enalizing the officer for the legislature's error . . . cannot logically contribute to the deterrence of Fourth Amendment violations.'" See *Krull*, 480 U. S., at 350. The same should be true of Davis's attempt here to "'[p]enaliz[e] the officer for the [appellate judges'] error.'" See *ibid.*

About all that exclusion would deter in this case is conscientious police work. Responsible law-enforcement officers will take care to learn "what is required of them" under Fourth Amendment precedent and will conform their conduct to these rules. *Hudson*, 547 U. S., at 599. But by the same token, when binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities. An officer who conducts a search in reliance on binding appellate precedent does no more than "'ac[t] as a reasonable officer would and should act'" under the circumstances. *Leon*, 468 U. S., at 920 (quoting *Stone*, 428 U. S., at 539–540 (White, J., dissenting)). The deterrent effect of exclusion in such a case can only be to discourage the officer from "'do[ing] his duty.'" 468 U. S., at 920.

That is not the kind of deterrence the exclusionary rule seeks to foster. We have stated before, and we reaffirm today, that the harsh sanction of exclusion "should not be applied to deter objectively reasonable law enforcement activity." *Id.,* at 919. Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.

IV

JUSTICE BREYER's dissent and Davis argue that, although the police conduct in this case was in no way cul-

————————

*Illinois* v. *Krull*, 480 U. S. 340 (1987), and the good-faith exception to searches conducted in reasonable reliance on the statute. See *State* v. *Daniel*, 291 Kan. 490, 497–504, 242 P. 3d 1186, 1191–1195 (2010).

pable, other considerations should prevent the good-faith exception from applying. We are not persuaded.

## A

### 1

The principal argument of both the dissent and Davis is that the exclusionary rule's availability to enforce new Fourth Amendment precedent is a retroactivity issue, see *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), not a good-faith issue. They contend that applying the good-faith exception where police have relied on overruled precedent effectively revives the discarded retroactivity regime of *Linkletter* v. *Walker*, 381 U. S. 618 (1965). See *post*, at 2–5.

In *Linkletter*, we held that the retroactive effect of a new constitutional rule of criminal procedure should be determined on a case-by-case weighing of interests. For each new rule, *Linkletter* required courts to consider a three-factor balancing test that looked to the "purpose" of the new rule, "reliance" on the old rule by law enforcement and others, and the effect retroactivity would have "on the administration of justice." 381 U. S., at 636. After "weigh[ing] the merits and demerits in each case," courts decided whether and to what extent a new rule should be given retroactive effect. *Id.*, at 629. In *Linkletter* itself, the balance of interests prompted this Court to conclude that *Mapp* v. *Ohio*, 367 U. S. 643—which incorporated the exclusionary rule against the States—should not apply retroactively to cases already final on direct review. 381 U. S., at 639–640. The next year, we extended *Linkletter* to retroactivity determinations in cases on direct review. See *Johnson* v. *New Jersey*, 384 U. S. 719, 733 (1966) (holding that *Miranda* v. *Arizona*, 384 U. S. 436 (1966), and *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), applied retroactively only to trials commenced after the decisions were released).

Over time, *Linkletter* proved difficult to apply in a con-

sistent, coherent way. Individual applications of the standard "produced strikingly divergent results," see *Danforth* v. *Minnesota*, 552 U. S. 264, 273 (2008), that many saw as "incompatible" and "inconsistent." *Desist* v. *United States*, 394 U. S. 244, 258 (1969) (Harlan, J., dissenting). Justice Harlan in particular, who had endorsed the *Linkletter* standard early on, offered a strong critique in which he argued that "basic judicial" norms required full retroactive application of new rules to all cases still subject to direct review. 394 U. S., at 258–259; see also *Mackey* v. *United States*, 401 U. S. 667, 675–702 (1971) (Harlan, J., concurring in part and dissenting in part). Eventually, and after more than 20 years of toil under *Linkletter*, the Court adopted Justice Harlan's view and held that newly announced rules of constitutional criminal procedure must apply "retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception." *Griffith*, *supra*, at 328.

2

The dissent and Davis argue that applying the good-faith exception in this case is "incompatible" with our retroactivity precedent under *Griffith*. See *post*, at 2; Reply Brief for Petitioner 3–7. We think this argument conflates what are two distinct doctrines.

Our retroactivity jurisprudence is concerned with whether, as a categorical matter, a new rule is available on direct review as a *potential* ground for relief. Retroactive application under *Griffith* lifts what would otherwise be a categorical bar to obtaining redress for the government's violation of a newly announced constitutional rule. See *Danforth*, *supra,* at 271, n. 5 (noting that it may "make more sense to speak in terms of the 'redressability' of violations of new rules, rather than the 'retroactivity' of such new rules"). Retroactive application does not, however, determine what "appropriate remedy" (if any) the

defendant should obtain.  See *Powell* v. *Nevada*, 511 U. S. 79, 84 (1994) (noting that it "does not necessarily follow" from retroactive application of a new rule that the defendant will "gain . . . relief").  Remedy is a separate, analytically distinct issue.  Cf. *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 189 (1990) (plurality opinion) ("[T]he Court has never equated its retroactivity principles with remedial principles").  As a result, the retroactive application of a new rule of substantive Fourth Amendment law *raises* the question whether a suppression remedy applies; it does not answer that question.  See *Leon*, 468 U. S., at 906 ("Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct'").

When this Court announced its decision in *Gant*, Davis's conviction had not yet become final on direct review.  *Gant* therefore applies retroactively to this case.  Davis may invoke its newly announced rule of substantive Fourth Amendment law as a basis for seeking relief.  See *Griffith*, *supra*, at 326, 328.  The question, then, becomes one of remedy, and on that issue Davis seeks application of the exclusionary rule.  But exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred.  See *Evans*, 514 U. S., at 13–14.  The remedy is subject to exceptions and applies only where its "purpose is effectively advanced."  *Krull*, 480 U. S., at 347.

The dissent and Davis recognize that at least some of the established exceptions to the exclusionary rule limit its availability in cases involving new Fourth Amendment rules.  Suppression would thus be inappropriate, the dissent and Davis acknowledge, if the inevitable-discovery exception were applicable in this case.  See *post*, at 3; Reply Brief for Petitioner 22 ("Doctrines such as inevitable

discovery, independent source, attenuated basis, [and] standing . . . sharply limit the impact of newly-announced rules"). The good-faith exception, however, is no less an established limit on the *remedy* of exclusion than is inevitable discovery. Its application here neither contravenes *Griffith* nor denies retroactive effect to *Gant*.[5]

It is true that, under the old retroactivity regime of *Linkletter*, the Court's decisions on the "retroactivity problem in the context of the exclusionary rule" did take into account whether "law enforcement officers reasonably believed in good faith" that their conduct was in compliance with governing law. *Peltier*, 422 U. S., at 535–537. As a matter of retroactivity analysis, that approach is no longer applicable. See *Griffith*, 479 U. S. 314. It does not follow, however, that reliance on binding precedent is irrelevant in applying the good-faith exception to the exclusionary rule. When this Court adopted the good-faith exception in *Leon*, the Court's opinion explicitly relied on *Peltier* and imported its reasoning into the good-faith inquiry. See 468 U. S., at 918–919. That reasonable reliance by police was once a factor in our retroactivity cases does not make it any less relevant under our *Leon*

———————

[5] The dissent argues that the good-faith exception is "unlike . . . inevitable discovery" because the former applies in all cases where the police reasonably rely on binding precedent, while the latter "applies only upon occasion." *Post*, at 3. We fail to see how this distinction makes any difference. The same could be said—indeed, the same *was* said—of searches conducted in reasonable reliance on statutes. See *Krull*, 480 U. S., at 368–369 (O'Connor, J., dissenting) (arguing that result in *Krull* was inconsistent with *Griffith*). When this Court strikes down a statute on Fourth Amendment grounds, the good-faith exception may prevent the exclusionary rule from applying "in *every* case pending when [the statute] is overturned." *Post*, at 3. This result does not make the Court's newly announced rule of Fourth Amendment law any less retroactive. It simply limits the applicability of a suppression remedy. See *Krull*, *supra*, at 354–355, n. 11.

line of cases.[6]

## B

Davis also contends that applying the good-faith exception to searches conducted in reliance on binding precedent will stunt the development of Fourth Amendment law. With no possibility of suppression, criminal defendants will have no incentive, Davis maintains, to request that courts overrule precedent.[7]

## 1

This argument is difficult to reconcile with our modern understanding of the role of the exclusionary rule. We have never held that facilitating the overruling of precedent is a relevant consideration in an exclusionary-rule case. Rather, we have said time and again that the *sole* purpose of the exclusionary rule is to deter misconduct by law enforcement. See, *e.g.*, *Sheppard*, 468 U. S., at 990 ("'adopted to deter unlawful searches by police'"); *Evans*, *supra,* at 14 ("historically designed as a means of deterring police misconduct").

We have also repeatedly rejected efforts to expand the focus of the exclusionary rule beyond deterrence of culpable police conduct. In *Leon,* for example, we made clear

---

[6] Nor does *United States* v. *Johnson*, 457 U. S. 537 (1982), foreclose application of the good-faith exception in cases involving changing law. *Johnson* distinguished *Peltier* and held that all Fourth Amendment cases should be retroactive on direct review so long as the new decision is not a "clear break" from prior precedent. 457 U. S., at 562. *Johnson* had no occasion to opine on the good-faith exception to the exclusionary rule, which we adopted two years later in *Leon*.

[7] Davis also asserts that a good-faith rule would permit "new Fourth Amendment decisions to be applied only prospectively," thus amounting to "a regime of rule-creation by advisory opinion." Brief for Petitioner 23, 25. For reasons discussed in connection with Davis's argument that application of the good-faith exception here would revive the *Linkletter* regime, this argument conflates the question of retroactivity with the question of remedy.

that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges." 468 U. S., at 916; see *id.*, at 918 ("If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect . . . it must alter the behavior of individual law enforcement officers or the policies of their departments"). *Krull* too noted that "legislators, like judicial officers, are not the focus" of the exclusionary rule. 480 U. S., at 350. And in *Evans*, we said that the exclusionary rule was aimed at deterring "police misconduct, not mistakes by court employees." 514 U. S., at 14. These cases do not suggest that the exclusionary rule should be modified to serve a purpose other than deterrence of culpable law-enforcement conduct.

2

And in any event, applying the good-faith exception in this context will not prevent judicial reconsideration of prior Fourth Amendment precedents. In most instances, as in this case, the precedent sought to be challenged will be a decision of a Federal Court of Appeals or State Supreme Court. But a good-faith exception for objectively reasonable reliance on binding precedent will not prevent review and correction of such decisions. This Court reviews criminal convictions from 12 Federal Courts of Appeals, 50 state courts of last resort, and the District of Columbia Court of Appeals. If one or even many of these courts uphold a particular type of search or seizure, defendants in jurisdictions in which the question remains open will still have an undiminished incentive to litigate the issue. This Court can then grant certiorari, and the development of Fourth Amendment law will in no way be stunted.[8]

——————

[8] The dissent does not dispute this point, but it claims that the good-faith exception will prevent us from "rely[ing] upon lower courts to work out Fourth Amendment differences among themselves." *Post*, at

Davis argues that Fourth Amendment precedents of *this* Court will be effectively insulated from challenge under a good-faith exception for reliance on appellate precedent. But this argument is overblown. For one thing, it is important to keep in mind that this argument applies to an exceedingly small set of cases. Decisions overruling this Court's Fourth Amendment precedents are rare. Indeed, it has been more than 40 years since the Court last handed down a decision of the type to which Davis refers. *Chimel* v. *California*, 395 U. S. 752 (overruling *United States* v. *Rabinowitz*, 339 U. S. 56 (1950), and *Harris* v. *United States*, 331 U. S. 145 (1947)). And even in those cases, Davis points out that no fewer than eight separate doctrines may preclude a defendant who successfully challenges an existing precedent from getting any relief. Brief for Petitioner 50. Moreover, as a practical matter, defense counsel in many cases will test this Court's Fourth Amendment precedents in the same way that *Belton* was tested in *Gant*—by arguing that the precedent is distinguishable. See Brief for Respondent in *Arizona* v. *Gant*, O. T. 2008, No. 07–542, pp. 22–29.[9]

At most, Davis's argument might suggest that—to prevent Fourth Amendment law from becoming ossified— the petitioner in a case that results in the overruling of one of this Court's Fourth Amendment precedents should

---

5. If that is correct, then today's holding may well lead to *more* circuit splits in Fourth Amendment cases and a *fuller* docket of Fourth Amendment cases in this Court. See this Court's Rule 10. Such a state of affairs is unlikely to result in ossification of Fourth Amendment doctrine.

[9] Where the search at issue is conducted in accordance with a municipal "policy" or "custom," Fourth Amendment precedents may also be challenged, without the obstacle of the good-faith exception or qualified immunity, in civil suits against municipalities. See 42 U. S. C. §1983; *Los Angeles County* v. *Humphries*, 562 U. S. ___, ___ (2010) (slip op., at 7) (citing *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 690–691 (1978)).

Opinion of the Court

be given the benefit of the victory by permitting the suppression of evidence in that one case. Such a result would undoubtedly be a windfall to this one random litigant. But the exclusionary rule is "not a personal constitutional right." *Stone*, 428 U. S., at 486. It is a "judicially created" sanction, *Calandra*, 414 U. S., at 348, specifically designed as a "windfall" remedy to deter future Fourth Amendment violations. See *Stone*, *supra*, at 490. The good-faith exception is a judicially created exception to this judicially created rule. Therefore, in a future case, we could, if necessary, recognize a limited exception to the good-faith exception for a defendant who obtains a judgment overruling one of our Fourth Amendment precedents. Cf. Friendly, The Bill of Rights as a Code of Criminal Procedure, 53 Cal. L. Rev. 929, 952–953 (1965) ("[T]he same authority that empowered the Court to supplement the amendment by the exclusionary rule a hundred and twenty-five years after its adoption, likewise allows it to modify that rule as the lessons of experience may teach" (internal quotation marks and footnotes omitted)).[10]

––––––––

[10] Davis contends that a criminal defendant will lack Article III standing to challenge an existing Fourth Amendment precedent if the good-faith exception to the exclusionary rule precludes the defendant from obtaining relief based on police conduct that conformed to that precedent. This argument confuses weakness on the merits with absence of Article III standing. See *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 624 (1989) (standing does not "'depen[d] on the merits of [a claim]'"). And as a practical matter, the argument is also overstated. In many instances, as in *Gant*, see 556 U. S., at __ (slip op., at 8), defendants will not simply concede that the police conduct conformed to the precedent; they will argue instead that the police conduct did not fall within the scope of the precedent.

In any event, even if some criminal defendants will be unable to challenge some precedents for the reason that Davis suggests, that provides no good reason for refusing to apply the good-faith exception. As noted, the exclusionary rule is not a personal right, see *Stone*, 428 U. S., at 486, 490, and therefore the rights of these defendants will not

But this is not such a case.  Davis did not secure a deci-sion overturning a Supreme Court precedent; the police in his case reasonably relied on binding Circuit precedent. See *United States* v. *Gonzalez*, 71 F. 3d 819.  That sort of blameless police conduct, we hold, comes within the good-faith exception and is not properly subject to the exclu-sionary rule.

\*　　\*　　\*

It is one thing for the criminal "to go free because the constable has blundered."  *People* v. *Defore*, 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926) (Cardozo, J.).  It is quite another to set the criminal free because the constable has scrupulously adhered to governing law.  Excluding evi-dence in such cases deters no police misconduct and im-poses substantial social costs.  We therefore hold that when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply.  The judgment of the Court of Appeals for the Eleventh Circuit is

*Affirmed.*

---

be impaired.  And because (at least in almost all instances) the prece-dent can be challenged by others, Fourth Amendment case law will not be insulated from reconsideration.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–11328

_____

## WILLIE GENE DAVIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2011]

JUSTICE SOTOMAYOR, concurring in the judgment.

Under our precedents, the primary purpose of the exclusionary rule is "to deter future Fourth Amendment violations." *Ante*, at 6; see, *e.g.*, *Herring* v. *United States*, 555 U. S. 135, 141 (2009); *Illinois* v. *Krull*, 480 U. S. 340, 347–348 (1987). Accordingly, we have held, application of the exclusionary rule is unwarranted when it "'does not result in appreciable deterrence.'" *Arizona* v. *Evans*, 514 U. S. 1, 11 (1995) (quoting *United States* v. *Janis*, 428 U. S. 433, 454 (1976)). In the circumstances of this case, where "binding appellate precedent specifically *authorize[d]* a particular police practice," *ante*, at 11—in accord with the holdings of nearly every other court in the country—application of the exclusionary rule cannot reasonably be expected to yield appreciable deterrence. I am thus compelled to conclude that the exclusionary rule does not apply in this case and to agree with the Court's disposition.

This case does not present the markedly different question whether the exclusionary rule applies when the law governing the constitutionality of a particular search is unsettled. As we previously recognized in deciding whether to apply a Fourth Amendment holding retroactively, when police decide to conduct a search or seizure in the absence of case law (or other authority) specifically

sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations:

> "If, as the Government argues, all rulings resolving unsettled Fourth Amendment questions should be nonretroactive, then, in close cases, law enforcement officials would have little incentive to err on the side of constitutional behavior. Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice would be excluded only in the one case definitively resolving the unsettled question." *United States* v. *Johnson*, 457 U. S. 537, 561 (1982) (footnote omitted).

The Court of Appeals recognized as much in limiting its application of the good-faith exception it articulated in this case to situations where its "precedent on a given point [is] unequivocal." 598 F. 3d 1259, 1266 (CA11 2010); see *id.*, at 1266–1267 ("[W]e do not mean to encourage police to adopt a '"let's-wait-until-it's-decided approach"' to 'unsettled' questions of Fourth Amendment law" (quoting *Johnson*, 457 U. S., at 561)). Whether exclusion would deter Fourth Amendment violations where appellate precedent does not specifically authorize a certain practice and, if so, whether the benefits of exclusion would outweigh its costs are questions unanswered by our previous decisions.

The dissent suggests that today's decision essentially answers those questions, noting that an officer who conducts a search in the face of unsettled precedent "is no more culpable than an officer who follows erroneous 'binding precedent.'" *Post*, at 7 (opinion of BREYER, J.). The Court does not address this issue. In my view, whether an officer's conduct can be characterized as "culpable" is not itself dispositive. We have never refused to apply the

exclusionary rule where its application would appreciably deter Fourth Amendment violations on the mere ground that the officer's conduct could be characterized as nonculpable. Rather, an officer's culpability is relevant because it may inform the overarching inquiry whether exclusion would result in appreciable deterrence. See *ante*, at 8 ("The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion var[y] with the culpability of the law enforcement conduct at issue" (internal quotation marks omitted; alteration in original)); see also, *e.g.*, *Herring*, 555 U. S., at 143 ("The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct"); *United States* v. *Leon*, 468 U. S. 897, 919 (1984) ("'Where the official action was pursued in complete good faith, . . . the deterrence rationale loses much of its force'" (quoting *Michigan* v. *Tucker*, 417 U. S. 433, 447 (1974))). Whatever we have said about culpability, the ultimate questions have always been, one, whether exclusion would result in appreciable deterrence and, two, whether the benefits of exclusion outweigh its costs. See, *e.g.*, *ante*, at 6–7; *Herring*, 555 U. S., at 141; *Krull*, 480 U. S., at 347.

As stated, whether exclusion would result in appreciable deterrence in the circumstances of this case is a different question from whether exclusion would appreciably deter Fourth Amendment violations when the governing law is unsettled. The Court's answer to the former question in this case thus does not resolve the latter one.

# SUPREME COURT OF THE UNITED STATES

———————

No. 09–11328

———————

## WILLIE GENE DAVIS, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[June 16, 2011]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins,
dissenting.

In 2009, in *Arizona* v. *Gant*, 556 U. S. \_\_\_, this Court
held that a police search of an automobile without a war-
rant violates the Fourth Amendment if the police have pre-
viously removed the automobile's occupants and placed
them securely in a squad car. The present case involves
these same circumstances, and it was pending on appeal
when this Court decided *Gant*. Because *Gant* represents a
"shift" in the Court's Fourth Amendment jurisprudence,
*ante*, at 1, we must decide *whether* and *how Gant'*s new
rule applies here.

I

I agree with the Court about *whether Gant*'s new rule
applies. It does apply. Between 1965, when the Court
decided *Linkletter* v. *Walker*, 381 U. S. 618, and 1987,
when it decided *Griffith* v. *Kentucky*, 479 U. S. 314, that
conclusion would have been more difficult to reach. Under
*Linkletter*, the Court determined a new rule's retroactivity
by looking to several different factors, including whether
the new rule represented a "clear break" with the past and
the degree of "reliance by law enforcement authorities on
the old standards." *Desist* v. *United States*, 394 U. S. 244,
248–249 (1969) (internal quotation marks omitted) (also

citing "the purpose to be served by the new standards" and "the effect on the administration of justice" as factors (internal quotation marks omitted)). And the Court would often not apply the new rule to identical cases still pending on appeal. See *ibid.*

After 22 years of struggling with its *Linkletter* approach, however, the Court decided in *Griffith* that *Linkletter* had proved unfair and unworkable. It then substituted a clearer approach, stating that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." 479 U. S., at 328. The Court today, following *Griffith*, concludes that *Gant's* new rule applies here. And to that extent I agree with its decision.

## II

The Court goes on, however, to decide *how Gant's* new rule will apply. And here it adds a fatal twist. While conceding that, like the search in *Gant,* this search violated the Fourth Amendment, it holds that, unlike Gant*,* this defendant is not entitled to a remedy. That is because the Court finds a new "good faith" exception which prevents application of the normal remedy for a Fourth Amendment violation, namely, suppression of the illegally seized evidence. *Weeks* v. *United States*, 232 U. S. 383 (1914); *Mapp* v. *Ohio*, 367 U. S. 643 (1961). Leaving Davis with a right but not a remedy, the Court "keep[s] the word of promise to our ear" but "break[s] it to our hope."

## A

At this point I can no longer agree with the Court. A new "good faith" exception and this Court's retroactivity decisions are incompatible. For one thing, the Court's distinction between (1) retroactive application of a new

rule and (2) availability of a remedy is highly artificial and runs counter to precedent. To determine that a new rule is retroactive *is* to determine that, at least in the normal case, there is a remedy. As we have previously said, the "source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law"; hence, "[w]hat we are actually determining when we assess the 'retroactivity' of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought." *Danforth* v. *Minnesota*, 552 U. S. 264, 271 (2008). The Court's "good faith" exception (unlike, say, inevitable discovery, a remedial doctrine that applies only upon occasion) creates "a categorical bar to obtaining redress" in *every* case pending when a precedent is overturned. *Ante*, at 13–14.

For another thing, the Court's holding re-creates the very problems that led the Court to abandon *Linkletter*'s approach to retroactivity in favor of *Griffith*'s. One such problem concerns workability. The Court says that its exception applies where there is "objectively reasonable" police "reliance on binding appellate precedent." *Ante*, at 1, 19. But to apply the term "binding appellate precedent" often requires resolution of complex questions of degree. Davis conceded that he faced binding anti-*Gant* precedent in the Eleventh Circuit. But future litigants will be less forthcoming. *Ante*, at 18. Indeed, those litigants will now have to create distinctions to show that previous Circuit precedent was not "binding" lest they find relief foreclosed even if they win their constitutional claim.

At the same time, Fourth Amendment precedents frequently require courts to "slosh" their "way through the factbound morass of 'reasonableness.'" *Scott* v. *Harris*, 550 U. S. 372, 383 (2007). Suppose an officer's conduct is consistent with the language of a Fourth Amendment rule that a court of appeals announced in a case with clearly

distinguishable facts? Suppose the case creating the relevant precedent did not directly announce any general rule but involved highly analogous facts? What about a rule that all other jurisdictions, but not the defendant's jurisdiction, had previously accepted? What rules can be developed for determining when, where, and how these different kinds of precedents do, or do not, count as relevant "binding precedent"? The *Linkletter*-like result is likely complex legal argument and police force confusion. See *Williams* v. *United States*, 401 U. S. 646, 676 (1971) (opinion of Harlan, J.) (describing trying to follow *Linkletter* decisions as "almost as difficult" as trying to follow "the tracks made by a beast of prey in search of its intended victim").

Another such problem concerns fairness. Today's holding, like that in *Linkletter*, "violates basic norms of constitutional adjudication." *Griffith*, *supra,* at 322. It treats the defendant in a case announcing a new rule one way while treating similarly situated defendants whose cases are pending on appeal in a different way. See *ante*, at 18–19. Justice Harlan explained why this approach is wrong when he said:

> "We cannot release criminals from jail merely because we think one case is a particularly appropriate one [to announce a constitutional doctrine] . . . . Simply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule constitute an indefensible departure from [our ordinary] model of judicial review." *Williams*, *supra,* at 679.

And in *Griffith*, the Court "embraced to a significant extent the comprehensive analysis presented by Justice Harlan." 479 U. S., at 322.

Of course, the Court may, as it suggests, avoid this unfairness by refusing to apply the exclusionary rule even to the defendant in the very case in which it announces a "new rule." But that approach would make matters worse. What would then happen in the lower courts? How would courts of appeals, for example, come to reconsider their prior decisions when other circuits' cases lead them to believe those decisions may be wrong? Why would a defendant seek to overturn any such decision? After all, if the (incorrect) circuit precedent is clear, then even if the defendant wins (on the constitutional question), he loses (on relief). See *Stovall* v. *Denno*, 388 U. S. 293, 301 (1967). To what extent then could this Court rely upon lower courts to work out Fourth Amendment differences among themselves—through circuit reconsideration of a precedent that other circuits have criticized? See *Arizona* v. *Evans*, 514 U. S. 1, 23, n. 1 (1995) (GINSBURG, J., dissenting).

## B

Perhaps more important, the Court's rationale for creating its new "good faith" exception threatens to undermine well-settled Fourth Amendment law. The Court correctly says that pre-*Gant* Eleventh Circuit precedent had held that a *Gant*-type search was constitutional; hence the police conduct in this case, consistent with that precedent, was "innocent." *Ante*, at 10. But the Court then finds this fact sufficient to create a new "good faith" exception to the exclusionary rule. It reasons that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," *ante*, at 6. The "deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue," *ante*, at 8 (internal quotation marks and brackets omitted). Those benefits are sufficient to justify exclusion where "police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment

rights," *ibid.* (internal quotation marks omitted). But those benefits do not justify exclusion where, as here, the police act with "simple, isolated negligence" or an "objectively reasonable good-faith belief that their conduct is lawful," *ibid.* (internal quotation marks omitted).

If the Court means what it says, what will happen to the exclusionary rule, a rule that the Court adopted nearly a century ago for federal courts, *Weeks* v. *United States*, 232 U. S. 383, and made applicable to state courts a half century ago through the Fourteenth Amendment, *Mapp* v. *Ohio*, 367 U. S. 643? The Court has thought of that rule not as punishment for the individual officer or as reparation for the individual defendant but more generally as an effective way to secure enforcement of the Fourth Amendment's commands. *Weeks*, *supra,* at 393 (without the exclusionary rule, the Fourth Amendment would be "of no value," and "might as well be stricken from the Constitution"). This Court has deviated from the "suppression" norm in the name of "good faith" only a handful of times and in limited, atypical circumstances: where a magistrate has erroneously issued a warrant, *United States* v. *Leon*, 468 U. S. 897 (1984); where a database has erroneously informed police that they have a warrant, *Arizona* v. *Evans*, 514 U. S. 1 (1995), *Herring* v. *United States*, 555 U. S. 135 (2009); and where an unconstitutional statute purported to authorize the search, *Illinois* v. *Krull*, 480 U. S. 340 (1987). See *Herring*, *supra,* at 142 ("good faith" exception inaptly named).

The fact that such exceptions are few and far between is understandable. Defendants frequently move to suppress evidence on Fourth Amendment grounds. In many, perhaps most, of these instances the police, uncertain of how the Fourth Amendment applied to the particular factual circumstances they faced, will have acted in objective good faith. Yet, in a significant percentage of these instances, courts will find that the police were wrong. And, unless

the police conduct falls into one of the exceptions previ-ously noted, courts have required the suppression of the evidence seized.  1 W. LaFave, Search and Seizure §1.3, pp. 103–104 (4th ed. 2004) ("good faith" exception has not yet been applied to warrantless searches and seizures beyond the "rather special situations" of *Evans*, *Herring*, and *Krull*).  See Valdes, Frequency and Success: An Em-pirical Study of Criminal Law Defenses, Federal Constitu-tional Evidentiary Claims, and Plea Negotiations, 153 U. Pa. L. Rev. 1709, 1728 (2005) (suppression motions are filed in approximately 7% of criminal cases; approximately 12% of suppression motions are successful); LaFave, *su-pra,* at 64 ("Surely many more Fourth Amendment viola-tions result from carelessness than from intentional con-stitutional violations"); Stewart, The Road to *Mapp v. Ohio* and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases, 83 Colum. L. Rev. 1365, 1389 (1983) ("[T]he vast majority of fourth amendment violations . . . [are] motivated by com-mendable zeal, not condemnable malice").

But an officer who conducts a search that he believes complies with the Constitution but which, it ultimately turns out, falls just outside the Fourth Amendment's bounds is no more culpable than an officer who follows erroneous "binding precedent."  Nor is an officer more culpable where circuit precedent is simply suggestive rather than "binding," where it only describes how to treat roughly analogous instances, or where it just does not exist.  Thus, if the Court means what it now says, if it would place determinative weight upon the culpability of an individual officer's conduct, and if it would apply the exclusionary rule only where a Fourth Amendment viola-tion was "deliberate, reckless, or grossly negligent," then the "good faith" exception will swallow the exclusionary rule.  Indeed, our broad dicta in *Herring*—dicta the Court repeats and expands upon today—may already be leading

lower courts in this direction. See *United States* v. *Julius*, 610 F. 3d 60, 66–67 (CA2 2010) (assuming warrantless search was unconstitutional and remanding for District Court to "perform the cost/benefit analysis required by *Herring*" and to consider "whether the degree of police culpability in this case rose beyond mere . . . negligence" before ordering suppression); *United States* v. *Master*, 614 F. 3d 236, 243 (CA6 2010) ("[T]he *Herring* Court's emphasis seems weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized . . . unless the officers engage in 'deliberate, reckless, or grossly negligent conduct'" (quoting *Herring*, *supra,* at 144)). Today's decision will doubtless accelerate this trend.

Any such change (which may already be underway) would affect not "an exceedingly small set of cases," *ante,* at 18, but a very large number of cases, potentially many thousands each year. See Valdes, *supra,* at 1728. And since the exclusionary rule is often the only sanction available for a Fourth Amendment violation, the Fourth Amendment would no longer protect ordinary Americans from "unreasonable searches and seizures." See *Wolf* v. *Colorado*, 338 U. S. 25, 41 (1949) (Murphy, J., dissenting) (overruled by *Mapp* v. *Ohio*, 367 U. S. 643 (1961)) (In many circumstances, "there is but one alternative to the rule of exclusion. That is no sanction at all"); *Herring*, *supra,* at 152 (GINSBURG, J., dissenting) (the exclusionary rule is "an essential auxiliary" to the Fourth Amendment). It would become a watered-down Fourth Amendment, offering its protection against only those searches and seizures that are *egregiously* unreasonable.

## III

In sum, I fear that the Court's opinion will undermine the exclusionary rule. And I believe that the Court wrongly departs from *Griffith* regardless. Instead I would

follow *Griffith,* apply *Gant'*s rule retroactively to this case, and require suppression of the evidence. Such an approach is consistent with our precedent, and it would indeed affect no more than "an exceedingly small set of cases." *Ante*, at 18.

For these reasons, with respect, I dissent.