Filed 9/30/15  P. v. Martinez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ANTHONY LEE MARTINEZ,<br><br>　　Defendant and Appellant. | G050494<br><br>(Super. Ct. No. 12CF3099)<br><br>O P I N I O N |

　　　　　　Appeal from a judgment of the Superior Court of Orange County, Kimberly Menniger and W. Michael Hayes, Judges.  Affirmed.

　　　　　　James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　　　Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Lise S. Jacobson, Stacy Tyler and Kimberley Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Anthony Lee Martinez of a variety of crimes, including driving under the influence and assaulting a police officer with a deadly weapon, i.e., his car. On appeal, he contends the trial court erred in denying his motion to suppress the results of his blood test, and there is insufficient evidence to support his assault conviction. We disagree and affirm the judgment.

*The Suppression Motion*

Before trial, defendant moved to suppress the results of his blood test on the basis the test was conducted without a judicially authorized warrant. The motion was based on stipulated facts:

"On October 19, 2012, at approximately 6:00 p.m., Placentia Police Officer Alcala was on duty, wearing a uniform, and driving a marked police vehicle. . . . Officer Alcala was flagged down by a passing motorist, who told him that the vehicle directly in front of him (defendant's vehicle) had collided with his vehicle and refused to stop to exchange information. Officer Alcala pulled behind [defendant's] vehicle to attempt a car stop in the area of Bristol and Civic Center. . . . Officer Alcala activated his emergency lights. Defendant made eye contact with Officer Alcala in his driver's side mirror and continued traveling southbound on Bristol for about two blocks . . . . When defendant reached Santa Ana Boulevard, he turned eastbound and fled at a high rate of speed. Officer Alcala activated his siren along with his overhead rotating lights and advised [dispatch] that he was now in pursuit of the vehicle.

"Defendant sped down Santa Ana Boulevard, weaving in and out of the eastbound lanes, and collided with a stop sign and a tree at the southwest corner of Santa Ana and Baker. Defendant's vehicle then came to a rest. Officer Alcala pulled in behind defendant's vehicle, leaving approximately ten to twelve feet between the two vehicles. . . . As [he] stepped out of his unit, with his service weapon drawn, he made eye contact

2

with defendant as defendant turned to look at him. Defendant then put his transmission into reverse and stepped on the accelerator, smoking the tires. Defendant then rammed his vehicle into Officer Alcala's patrol unit, causing him to jump out of the way."

After that, the chased resumed. With Officer Alcala in hot pursuit, defendant "fled eastbound on Santa Ana at a high rate of speed [until he eventually] crashed into a parked car on the southwest corner of Flower and Pine while attempting to complete a right turn. To prevent defendant from fleeing another time . . ., Officer Alcala positioned his unit's push bumper directly against defendant's rear bumper and put the transmission into 'park.' Defendant again put his transmission into reverse and stepped on the accelerator, smoking the tires. Santa Ana Police officers arrived seconds after the final collision and assisted Officer Alcala in taking defendant into custody.

"Santa Ana Police Officer Valenzuela responded to the area of Pine and Flower. He contacted defendant at the scene and noticed [his] eyes were red, watery, and bloodshot. Defendant's speech was slurred, and he had a strong odor of an alcoholic beverage on his breath. Due to defendant's injury, he was transported to Western Medical Center by ambulance. . . .

"Corporal Bell responded to the hospital and conducted a DUI investigation. When [he] arrived at the hospital, defendant was in the room where the CAT scans are performed, yelling at the hospital staff that he would not let them do the [procedure] unless his mother was with him. Corporal Bell noticed that defendant's speech was slurred as he was yelling. After [he] explained to defendant how the [CAT scan] was for his benefit . . ., defendant still refused to cooperate. He was transported to a regular room in the hospital. Corporal Bell was able to get close enough to defendant to smell a very strong odor of an alcoholic beverage on [his] breath, and could see that defendant's eyes were watery and droopy. Corporal Bell attempted to ask defendant the DUI interview questions from the arrest report form, but defendant refused to answer any of them.

3

"Corporal Bell told defendant that he believed [he] was under the influence of an alcoholic beverage and/or drugs. He told defendant that a blood sample would be taken from him. Defendant first refused to consent to give a sample of his blood. . . . Corporal Bell told defendant that he was going to have a blood technician take a sample of his blood anyway. Defendant then stated that he would only give his blood if the officers tested it for heroin. At 7:35 p.m. Corporal Bell had [a technician] take a sample of blood from defendant, which was retained and book[ed] at the Orange County Sheriff's Crime Lab."

The parties further stipulated defendant's blood was drawn in a medically approved manner, although the police did not try to get a search warrant before the draw. Testing revealed defendant's blood alcohol level was .18 percent, over twice the legal limit.

Defendant moved to suppress the results of his blood draw on Fourth Amendment grounds. He argued the draw was illegal because it was conducted without a warrant and in the absence of exigent circumstances. The trial court did not render an opinion as to whether defendant's blood draw was lawful. Instead, it denied defendant's motion based on the good faith exception to the warrant requirement. As we now explain, that ruling is unassailable.

At the time this case arose in 2012, the law respecting warrantless blood draws was based on the United States Supreme Court's decision in *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*). *Schmerber* held probable cause alone could justify such a draw if the officer ordering it reasonably believed he "was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence[.]" (*Id.* at p. 770.) Given the natural dissipation of alcohol over time and the delays inherent in obtaining a warrant, *Schmerber* determined the need to ascertain a person's blood-alcohol level may present an exigency that justifies a warrantless blood draw. (*Id.* at pp. 770-771.)

4

Although *Schmerber* did not expressly so hold, many courts interpreted it as establishing a per se exigency rule in drunk driving cases. In fact, in *People v. Superior Court (Hawkins)* (1972) 6 Cal.3d 757, the California Supreme Court construed *Schmerber* as authorizing the warrantless blood draw of a suspected drunk driver, so long as the draw is conducted "in a medically approved manner, is incident to lawful arrest, and is based upon the reasonable belief that the person is intoxicated." (*Id*. at p. 761.) Following *Hawkins*, "our Supreme Court and this state's intermediate appellate courts uniformly reiterated that a warrantless blood draw was justified under the Fourth Amendment if 'the arresting officer has reasonable cause to believe the arrestee is intoxicated' with alcohol [citation], and those courts did not require any additional showing of exigency to excuse the lack of a warrant. [Citations.]" (*People v. Harris* (2015) 234 Cal.App.4th 671, 702.)

However, in 2013, six months after defendant's blood was drawn in this case, the United States Supreme Court decided *Missouri v. McNeely* (2013) 569 U.S. __ [133 S.Ct. 1552] (*McNeely*). *McNeely* held the natural dissipation of alcohol from the body does not, by itself, constitute exigent circumstances justifying a warrantless search in the form of a blood draw from a person who is suspected of drunk driving. (*Id*. at p. 1568.) Although natural dissipation is an important factor in determining the reasonableness of a warrantless blood draw, *McNeely* ruled exigency "must be determined case by case based on the totality of the circumstances." (*Id*. at p. 1556.)

While Supreme Court opinions are *generally* given retroactive effect to cases pending on appeal (*Griffith v. Kentucky* (1987) 479 U.S. 314), that does not mean defendant is entitled to relief based on the *McNeely* decision. Even if the totality of the circumstances presented in this case did not justify a warrantless blood draw, we would still have to decide whether the remedy of suppression would be appropriate. (*Davis v.*

5

*United States* (2011) 564 U.S. __, __ [131 S.Ct. 2419, 2430-2431] (*Davis*) [retroactive application of a judicial opinion does not dictate what remedy, if any, the defendant should obtain].)

In *Davis*, the court considered whether the exclusionary rule should be applied when the police conduct a search in compliance with binding precedent that is later overruled. (*Davis, supra*, 131 S.Ct. at p. 2423.) In particular, the court had to decide whether the good faith exception to the exclusionary rule applied to a search conducted before it narrowed the permissible scope of warrantless automobile searches in *Arizona v. Gant* (2009) 556 U.S. 332. *Davis* held, "[b]ecause suppression would do nothing to deter police misconduct in these circumstances, and because it would come at a high cost to both the truth and the public safety, . . . searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis, supra*, 131 S.Ct. at pp. 2423-2424.)

The same rationale applies in this case. Because the California Supreme court and the intermediate appellate courts of this state had consistently interpreted *Schmerber* as permitting a warrantless blood draw under the circumstances presented in this case, there is no reason to apply the exclusionary rule to bar the results of that procedure. Although defendant argues the police should have known California's exigency per se rule was out of line with the United States Supreme Court's totality-of-the-circumstances approach, he forgets the job of the police is to *follow* the law, not *interpret* it. The officers in this case "were in no way culpable for following the law of this state that had been settled for just over 40 years. To penalize [them] for the courts' error, which was only brought to light *after* defendant's blood draw, would not logically serve to deter future Fourth Amendment violations. [Citation.] Therefore, because [they] acted 'in objectively reasonable reliance on binding appellate precedent' interpreting *Schmerber*, [the results of defendant's blood test are] not subject to the exclusionary rule. [Citation.]" (*People v. Harris, supra,* 234 Cal.App.4th at p. 703.)

6

Accordingly, the trial court did not error in denying defendant's suppression motion. Regardless of whether the police violated defendant's Fourth Amendment rights by drawing his blood without a warrant, the exclusionary rule is inapt in light of the good faith rule.

*Sufficiency of the Evidence*

Defendant also contends there is insufficient evidence to support the jury's finding he assaulted Officer Alcala with a deadly weapon when he backed his car into the officer's vehicle. This claim also fails.

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the verdict, drawing all inferences that reasonably support it, and determine whether it contains substantial evidence – that is, evidence which is reasonable, credible, and of solid value – from which a trier of fact could rationally find the defendant guilty beyond a reasonable doubt. [Citations.] In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses. [Citation.] Moreover, because it is the jury, not the reviewing court, that must be convinced of the defendant's guilt beyond a reasonable doubt, we are bound to sustain a conviction that is supported by only circumstantial evidence, even if that evidence is also reasonably susceptible of an interpretation that suggests innocence. [Citation.]" (*People v. Little* (2004) 115 Cal.App.4th 766, 771; see also *People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) The gravamen of the offense "'is the *likelihood* that the force applied or attempted to be applied will result in great bodily injury.' [Citation.]" (*People v. Williams* (2001) 26 Cal.4th 779, 787.) In other words, the crime focuses on what might happen, not what did happen or

7

what the victim intended.  (*Id*. at pp. 787-788.)  Accordingly, actual injury to the victim is not required.  (*People v. Valdez* (1985) 175 Cal.App.3d 103, 113.)  "[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another."  (*People v. Williams, supra,* 26 Cal.4th at p. 790.)

Here, the record shows that after defendant hit a tree at the intersection of Santa Ana and Baker, Alcala pulled up about 10-12 feet behind his car.  Alcala parked his squad car in the "offset position," meaning he positioned the center of his vehicle in line with the left rear corner of defendant's car.  With his gun drawn, Alcala exited his car and started walking toward defendant's car, but he only got a couple of feet before defendant put his car in reverse and rammed into Alcala's squad car.  Even though the two cars were only 10-12 feet apart, defendant accelerated so rapidly there was smoke coming from his tires.

Describing his position at the time of the collision, Alcala testified he was "kind of in no man's land."  He had just cleared his door, which was still open, and was walking toward defendant's car when defendant made eye contact with him and threw his car into reverse.  Although he was not directly behind defendant's car, i.e., in the direct path of the car, Alcala "had to jump out of the way."  "At most," he was "just a couple feet" away from the door of his squad car when the collision occurred.  The force of the impact "jolted [Alcala's] entire [squad car] causing the whole car" to move.  Asked if he felt he was in danger of being struck, Alcala answered in the affirmative, saying either his car or defendant's car could have hit him.  As it turned out, the collision only resulted in a few dents and scratches to the right side of Alcala's front push bumper.

Relying on the fact Alcala was not inside his squad car or in the direct path of harm when he was backing up his car, defendant contends no reasonable person could conclude his actions were likely to result in the application of physical force to the

officer. However, despite the fact Alcala was off to the side of the cars when the collision occurred, he was standing only a few feet away from his open car door. Not knowing how the incident was going to play out, he felt he had to jump out of the way to avoid being hit by either his or defendant's car. Given the inherent unpredictability of automobile crashes, this belief was not unreasonable; the circumstances clearly suggest Alcala was in the zone of danger when the collision occurred. In fact, while defendant claims he wasn't going very fast when he backed into Alcala's squad car, his tires were smoking, and the force of the impact caused Alcala's entire car to move. Granted, Alcala's push bumper only sustained minor damage, but that is easily explainable by the fact it is comprised of solid, heavy-duty metal, as opposed to the standard chrome or plastic – or human being. All things considered, a jury could reasonably find defendant's actions would directly and probably cause harm to Alcala.

Defendant also makes the closely related but differently phrased argument he did not use his car as a deadly weapon since he did not drive directly toward Alcala. But as explained, defendant did smash his car directly into Alcala's vehicle while the officer was standing in close proximity to his open car door. For the reasons explained above, it was reasonable for the jury to conclude defendant used his car in a manner that was capable of producing and likely to produce great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1029.) We see nothing to justify disturbing the jury's verdict.

DISPOSTION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.