Filed 3/3/16  P. v. Almanza CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS ALFREDO ALMANZA,<br><br>    Defendant and Appellant. | 2d Crim. No. B258565<br>(Super. Ct. No. 1434130)<br>(Santa Barbara County) |

A jury convicted appellant of kidnapping for extortion (Pen. Code, § 209, subd. (a))[1] and torture (§ 206) and found true weapons use and criminal street gang allegations (§§ 186.22, subd. (b)(4), 12022, subd. (b)(1), 12022.53, subds. (b), (e)).  The trial court sentenced him to life without the possibility of parole plus a consecutive 11 years for the weapons use and gang enhancements.  Appellant contends that evidence taken from his cell phone without a warrant should have been excluded and that the jury was improperly instructed that conspiracy is a basis for his criminal liability.  We affirm.

---

    [1] All statutory references are to the Penal Code.

FACTS

Appellant, a Sureño gang associate, worked for codefendant Raymond Macias, the Sureño "crew chief" in Santa Barbara County, and Juan Zavala, Macias's "right-hand man." He was an "enforcer" in Lompoc who helped collect "taxes," i.e., a percentage of drug profits paid by Sureño-affiliated gangs in exchange for the ability to operate within their territory and, should members be arrested, protection in prison.

Victim Stephen Mendibles was in charge of collecting taxes in Lompoc for the Sureños. Because "a lot of [his] homeboys were getting arrested" and becoming enemies, "it was hard for [him] to come up with the money." Eventually, he "couldn't do it anymore" and "just [lay] low." Zavala told appellant to find Mendibles and "put him on a payment plan."

Appellant told Mendibles' cousin Philip Lopez that Macias "wanted [Mendibles] bad . . . because he owed money." He asked Lopez to find Mendibles and bring him to Ivan Rodriguez's house, where appellant was staying. Lopez assumed they were going to "check" Mendibles, i.e., punish him for breaching the rules using physical discipline ranging from an assault to a stabbing.

Mendibles called Lopez and told him to come over to talk about the situation. When Lopez hung up, he told appellant he was going to get Mendibles. Appellant told Gabriel Luna, a member of Macias's and Zavala's gang, to go with him. He asked if Luna had "that thing," to which Luna responded by displaying a gun. Appellant told Lopez to "come to the back when you get here."

When Lopez found Mendibles, he told him, "Get ready, let's go, we're going to see [Macias]. We're going to talk about this." Mendibles did not think he could refuse because Lopez and Luna "came for a reason" and probably would have fought him. He thought if he went with them he would "probably just get beat up real quick and that was it." He went with them to Rodriguez's house. They brought him to the garage.

2

Appellant, who was standing in the middle of the garage holding a knife, told Mendibles, "Get in the fuckin' middle." Mendibles walked towards appellant, who swung his fist at him. Mendibles "dodged [the] punch, grabbed [appellant] by his torso, and . . . threw him on the floor." At that point, Lopez, his brother, and Luna "rushed" Mendibles and started punching him in the back of his head and upper body.

Mendibles then felt "bad pain" on his elbow. Appellant, who was holding a hatchet or "axe hammer," had hit him with the flat side of the blade. Appellant raised the weapon again. Mendibles tried to block it with his arm. The sharp end of the blade struck him under his armpit and stuck there. When appellant pulled it away, blood started "gushing out." Lopez and his brother looked scared and told appellant to stop.

Appellant had Lopez, his brother, and Luna hold Mendibles against a wall and search him. They took his shoes, wallet, watch, necklace, cell phone, iPod, hat, and jacket. Appellant told him, "You're fucking done. We're going to make your ass squeal like a fuckin' pig." Mendibles was forced to sit on a milk crate. Appellant had the others bind his ankles, tie his hands behind his back, and place duct tape over his mouth. Luna was pacing back and forth with the gun in his hand, saying, "You fucked up, motherfucker. We've been looking for you." Lopez and Rodriguez put down plastic sheeting underneath the crate and all over the garage "[s]o they wouldn't get . . . blood anywhere."

For the next few hours, men came in and out of the garage while Mendibles remained bound and gagged. Mendibles heard appellant say, "We're waiting for [Macias]." He thought he was going to be killed.

Macias and Zavala entered the garage. Macias said, "Damn, dog . . . . I hate to see you like this . . . . Look at you. But you know what happens. You know what happens when you play with my money. These fools ain't playing." Macias told Mendibles he owed $800 for back pay on taxes and $300 for "dope." Mendibles did not believe he owed Macias $800 "for something that [he] didn't

3

even have control of." He agreed to pay the $1,100 Macias demanded, half in three days and the rest in two weeks, because he "thought that was [his] only way out."

Macias told appellant to let Mendibles go. As appellant untied Mendibles, he flicked ashes from his cigarette on top of Mendibles' head and said, "You're lucky, you bitch." Mendibles' clothes and wallet were returned to him. His captors kept his watch, necklace, iPod, and the money from his wallet, approximately $40. Luna broke his phone. Macias told Mendibles that he could have three days for his arm to heal but then "was going to get poked"—meaning he would be stabbed, not lethally—by Lopez.

When Mendibles was released, he "[lay] low" again. He did not pay Macias. After three days, Lopez looked for Mendibles but could not find him.

DISCUSSION

*Warrantless Collection of Cell Phone Evidence*

When appellant was arrested, his cell phone was seized from him. At trial, text messages obtained from his phone were read to the jury and admitted into evidence. Appellant contends that the warrantless search of his cell phone's contents incident to his arrest violated the Fourth Amendment and that he is entitled to be retried without the use of this illegally obtained evidence.[2]

More than two years before appellant's cell phone was seized, the California Supreme Court held that "the Fourth Amendment . . . permits law enforcement officers . . . to conduct a warrantless search of the text message folder of a cell phone they take from his person after the arrest." (*People v. Diaz* (2011) 51 Cal.4th 84, 88 (*Diaz*).) Five days after appellant was found guilty, the United States Supreme Court abrogated *Diaz*, holding that "a warrant is generally required before [searching the information on a cell phone], even when [the] cell phone is seized incident to arrest." (*Riley v. California* (2014) __ U.S. __, [134 S.Ct. 2473, 2493] (*Riley*).)

_____

[2] Although the record is silent, we assume for the sake of argument that the cell phone search was conducted without a warrant.

4

That a warrantless search of appellant's cell phone violated his Fourth Amendment rights does not mean, as appellant contends, that the text messages should have been excluded from his trial. When, as here, "the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply." (*Davis v. United States* (2011) 564 U.S. 229 [131 S.Ct. 2419, 2434] (*Davis*).)

Relying on Justice Sotomayor's concurring opinion, appellant argues that *Davis* has no application "when the law governing the constitutionality of a particular search is unsettled." (*Davis*, *supra*, 131 S.Ct. at p. 2435 [Sotomayor, J., concurring].) Justice Sotomayor's concurrence, which represents her views alone, is not binding on any court. More importantly, the law governing the constitutionality of the search here was settled in California—the relevant jurisdiction. It is inconsequential that courts in other jurisdictions cited by appellant had reached different conclusions.

In searching the contents of appellant's cell phone pursuant to his arrest, the police relied on the California Supreme Court's binding precedent in *Riley*. Because their reliance was objectively reasonable, exclusion of the evidence they obtained was not required.

*Conspiracy Instruction*

The trial court instructed the jury that it could find appellant guilty of the offenses on any of several theories of criminal liability: (1) directly perpetrating the crime; (2) aiding and abetting the perpetrator; (3) natural and probable consequence liability; and, at issue here, (4) conspiring to commit the crimes. Appellant, who was not charged with conspiracy, contends that an uncharged conspiracy is not a valid basis for criminal liability in California because the Penal Code defines conspiracy only as a substantive offense.

To the contrary, the California Supreme Court has "'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator. [Citations.] "Failure to charge conspiracy as a

5

separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' [Citations.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 150; see also *People v. Hajek* (2014) 58 Cal.4th 1144, 1200-1201.) We, as an intermediate appellate court, are bound by the California Supreme Court's decisions. (E.g., *People v. Kennedy* (2011) 194 Cal.App.4th 1484, 1492.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.



PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Patricia L. Kelly, Judge

Superior Court County of Santa Barbara

_____

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Steven E. Mercer and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.