BROWN, Circuit Judge,
dissenting:
Today the Court’s opinion attempts to write the good faith exception out of our case law. Nothing in the record suggests the officers involved in this ease were doing anything other than attempting to solve an unsolved murder while scrupulously observing the letter of the law. Yet, today’s opinion impugns their motives by declaring their reliance upon a search warrant approved by a disinterested magistrate to be “entirely unreasonable.” It also misconstrues the very purpose of the exclusionary rule and the point of the good faith exception by applying the former and rejecting the latter in a way that contradicts precedent from both the Supreme Court and this Court. Because I believe the good faith exception to the exclusionary rule easily encompasses the facts of this case, I respectfully dissent.
I. ■
A.
As explained by the Supreme Court, “[t]he Fourth Amendment protects the right of the people to be secure in their *1282 persons, houses, papers, and effects, against unreasonable searches and seizures ... [but] says nothing about suppressing evidence obtained in violation of .this command.” Davis v. United States, 564 U.S. 229, 236, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011). Consequently, the use of evidence obtained pursuant to an unlawful search or seizure “work[s] no new Fourth Amendment wrong.” United States v. Calandra, 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Moreover, the exclusion of evidence is “not a personal constitutional right,” Stone v. Powell, 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), “nor is it designed to redress the injury occasioned by an unconstitutional search,” Davis, 564 U.S. at 236, 131 S.Ct. 2419. Instead, the exclusionary rule is a “prudential doctrine” created to “compel respect” for the Fourth Amendment’s guaranty against unreasonable searches and seizures. Id.
Deterring law enforcement officials from engaging in future Fourth Amendment violations supports this goal. Herring v. United States, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009); Calandra, 414 U.S. at 348, 94 S.Ct. 613. However, the mere fact that the exclusion of evidence would result in deterrence is alone insufficient to justify the exclusion of evidence. See Hudson v. Michigan, 547 U.S. 586, 596, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (stating the existence of deterrence benefits “is a necessary condition for exclusion,” but not a “sufficient” one); see also Calandra, 414 U.S. at 350, 94 S.Ct. 613 (stating the Fourth Amendment does not “require[ ] adoption of every proposal that might deter police misconduct”). For this reason, the Supreme Court has limited the exclusionary rule’s application to situations where the rule’s deterrence purpose is “most efficaciously served.” United States v. Leon, 468 U.S. 897, 908, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Thus, “[wjhere suppression fails to yield ‘appreciable deterrence,’ exclusion is ‘clearly ... unwarranted.'” Davis, 564 U.S. at 237, 131 S.Ct. 2419 (quoting United States v. Janis, 428 U.S. 433, 454, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976)).
■ The calculus is simple: The suppression of evidence that is otherwise probative and reliable results in “substantial social costs.” Leon, 468 U.S. at 907, 104 S.Ct. 3405. “The principal cost' of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system.” Herring, 555 U.S. at 141, 129 S.Ct. 695. Furthermore, if applied indiscriminately, courts run the risk of “generating disrespect for the law and administration of justice.” Stone, 428 U.S. at 491, 96 S.Ct. 3037. Society, the Supreme Court has held, “must swallow this bitter pill” only “as a last resort.” Davis, 564 U.S. at 237, 131 S.Ct 2419. Therefore, in addition to showing the suppression of evidence will significantly deter unlawful behavior in the future, parties arguing for suppression must overcome the “high obstacle” of the rule’s “costly toll upon truth-seeking, and law enforcement objectives” through demonstrating the benefits of suppression outweigh these significant costs. Herring, 555 U.S. at 141, 129 S.Ct. 695.
In United States v. Leon, the Supreme Court recognized a good faith exception to the exclusionary rule for evidence obtained by law enforcement officers acting in “objectively reasonable reliance” on a search warrant issued by a “detached and neutral magistrate” that has ultimately been found to be invalid. Leon, 468 U.S. at 913, 920-22, 104 S.Ct. 3405. The Court explained “the. exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates.” Id. at 916, 104 S.Ct. 3405. Furthermore, “[i]n the ordinary case, an officer cannot be *1283 expected to question the magistrate’s probable-cause determination.” Id. at 921, 104 S.Ct. 3405. Thus, “a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.” Id. at 922, 104 S.Ct. 3405.
The only instances in which the good faith exception does not apply are when the law enforcement officers are “reckless,” “dishonest,” or “could not have harbored an objectively reasonable belief in the existence of probable cause.” Id. at 926, 104 S.Ct. 3405; see also Illinois v. Krull, 480 U.S. 340, 348-49, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (stating “evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional”). Accordingly,. if a magistrate relies upon a “bare bones” affidavit that is “so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,” suppression is appropriate. Leon, 468 U.S. at 923 & n.24, 104 S.Ct. 3405,[1] However, the use of such an extreme remedy when law enforcement officers have sought a warrant is extremely rare, and the Supreme Court has only applied the exclusionary rule to such situations where police conduct was both intentional and highly culpable, Herring, 555 U.S. at 143-44, 129 S.Ct. 695; see also Davis, 564 U.S. at 240, 131 S.Ct. 2419 (stating the Supreme Court has “never applied th,e exclusionary rule to suppress evidence obtained as a result of nonculpa-ble, innocent police conduct”).
Furthermore, Supreme Court case law makes clear that a “bare bones” affidavit is one supported only by the “bare conclusions of others.” Illinois v. Gates, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); see also Nathanson v. United States, 290 U.S. 41, 44-47, 54 S.Ct. 11, 78 L.Ed. 159 (1933) (invalidating a warrant supported only by an affidavit stating the officer “ha[d] cause to suspect and [did] believe that” liquor illegally brought into the United States was located on certain premises); Aguilar v. Texas, 378 U.S. 108, 109-15, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (invalidating a warrant based solely on an officer’s statement that he had “received reliable information from a credible person and [did] believe” that heroin was stored in a particular home); Giordenello v. United States, 357 U.S. 480, 486, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) (striking a warrant issued where the complaint contained “no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,” failed to “indicate any sources for the complainant’s belief,” and did not set forth “any other sufficient basis upon which a finding of probable cause could be made”). Thus, only where an affidavit is “so lacking in sworn and particularized information that not even an order of court [could] have justified [the search]” can it be properly *1284 characterized as bare bones. See Herring, 555 U.S. at 143-44, 129 S.Ct. 695.
B.
The warrant in this case established probable cause for the search. The affidavit submitted by Detective Giannakoulias begins by giving the exact address of the apartment to be searched and describing the building in which it is located. It then details Detective Giannakoulias’s extensive experience as a law enforcement officer, including 22 years of service at the Metropolitan Police Department, formal training in criminal, death, gang, and narcotics investigations, 10 years of experience investigating gang-related murders, and the execution of over 500 search warrants for various drug and violent crimes. The next 8 pages of the affidavit provide detailed information of the investigation of the murder of Mico Briscoe—a crime that took place over a year before police sought the current search warrant—and Ezra Griffith’s connection to the crime.
The affidavit described the murder and the existence of video footage capturing a gold, four-door sedan leaving the scene of the crime with two murder suspects in it. It then described the police’s efforts to identify and locate the car captured by the surveillance footage, which eventually led them to Ms. Jesimenia Queen—Griffith’s mother—who they then interviewed about the car and its connection to the Briscoe murder. Queen confirmed the car used to belong to her and was used exclusively by Griffith, “a validated member” of the “E Street Bangaz” gang. App’x 30-31. After he became aware of this interview, Griffith made jail house calls to numerous people, including his mother, his grandmother, Dwayne Hilton, and Sheree Lewis. These calls often discussed the police interview about the car and its association with the Briscoe murder. 20 days after making these calls, Griffith was released from prison, and police were eventually able to locate his address as being with Lewis at the location for which they sought a warrant.
Only after providing all of these details did Detective Giannakoulias rely on his training and experience to assert that gang members maintain regular contact with each other, even while incarcerated, and they discuss criminal activities through phones or other electronic devices. The affidavit ends by requesting the seizure of:
all electronic devices to include but not limited to cellular telephone(s), computers), electronic tablet(s), devices capable of storing digital images (to include, but not limited to, PDAs, CDs, DVD’s jump/zip drives), evidence of ownership of such devices, subscriber information relating to the electronic devices, any information describing, referencing, or mentioning in anyway the [shooting death of Mico Briscoe], any handwritten form (such as writing to include but not limited to notes, papers, or mail matter), photographs, newspaper articles relating to the shooting death of Mico Briscoe, and any indicia of occupancy of the premises described above.
App’x 36. After reviewing Detective Gian-nakoulias’s affidavit, a magistrate from the Superior Court of the District of Columbia determined that it established probable cause and authorized law enforcement officers to seize the items listed in the affidavit.
Even if this Court were to assume Detective Giannakoulias’s affidavit failed to establish probable cause to search Lewis’s apartment, I can find no discernable basis to justify the Court’s assertion that the warrant was “so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.” Maj. Op. at 1278. Based on the affidavit, it was reasonable for the magistrate to conclude *1285 Griffith was either directly involved with the Briscoe murder or had vital information regarding its commission. Additionally, the police knew Griffith actively communicated with both his family and other suspects about the Briscoe murder while he was incarcerated. These communications provided concrete facts to support Detective Giannakoulias’s assertion that gang members share intelligence with each other, even while incarcerated. Moreover, there was at a minimum a fair probability that Griffith would continue to have conversations about the investigation of the Briscoe murder, given the close proximity of his release from prison with his last jailhouse call—a mere 20 days. An investigator’s common sense would also lead him to conclude that Griffith would speak much more freely and candidly about his involvement in the Briscoe murder once his communications were not being monitored by the police.[2] Thus, concrete facts existed from which investigators could infer Griffith was involved with the Briscoe murder and was talking to his confederates ■ about it.
In dismissing these logical inferences, the Court focuses on the fact that the affidavit does not mention Griffith owning or using a cell phone. But these statements ignore the realities of the world in which we live and jettison the common-sense inquiry judges are to make when determining the existence of probable cause. See Gates, 462 U.S. at 238, 103 S.Ct. 2317 (“The task of the issuing magistrate is simply to make a practical, common-sense decision whether ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.”); see also United States v. Davis, 617 F.2d 677, 692 (D.C. Cir. 1979) (stating judges evaluating the existence of probable cause “need not confine their evaluations within rigorous legalistic boundaries but instead may use their common sense”). The Supreme Court has recognized that “a significant majority of American adults now own [cell] phones.” Riley v. California, — U.S. -, 134 S.Ct. 2473, 2484, 189 L.Ed.2d 430 (2014). This statement is confirmed by the Pew Research Center, whose research indicates that in 2013 over 90% of American adults owned a cell phone. See Lee R'ainie, Cell Phone Ownership Hits 9i% of Adults, Pew Research Center (June 6, 2013), http://www. pewresearch.org/fact-tank/2013/06/06/cell-phone-ownership-hits-91-of-adults/. Furthermore, this number jumps up to 57% for adults between ages 18 and 34. Id. Thus, the Court’s assertion that the affi-ant’s failure to allege that Griffith owned a cell phone somehow resulted in a bare bones affidavit devoid of any indicia of probable cause that Griffith did, in fact, own a cell phone is “[p]ure applesauce.” King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2501, 192 L.Ed.2d 483 (2015) (Scalia, J., dissenting).
While the Court is, admittedly, on firmer grounds when assessing the warrant’s shortfalls as to other electronic devices, this is an issue of breadth, not whether there was any indicia of probable cause, and this Court has never refused to apply the good faith exception because a warrant was overbroad. On the contrary, this Court’s previous approach has been to “decline to. order the suppression of the evidence seized pursuant to” a warrant “we conclude[d] ... was overly broad” so long as the law enforcement officers “reasonably relied on the warrant in good faith/’ United States v. Maxwell, 920 F.2d 1028, *1286 1034 (D.C. Cir. 1990). In United States v. Maxwell, this Court applied the good faith exception to a fatally overbroad warrant authorizing the seizure of all of the following:
any. and all seals representing or appearing to represent any agency of the United States; any and all writings and documents representing or appearing to represent any agency of the United States; any interstate or foreign correspondence, handwritten notes, carbons, bank records, negotiable, instruments, logs, ledgers, address books, travel documents, memoranda or notations pertaining to interstate or foreign commerce; transmissions made pertaining to interstate or foreign commerce; any and all documents generated in connection with or evidencing a scheme, artifice or devise of transactions in interstate or foreign commerce; any. electronic memory equipment, materials, tapes, records, discs, discettes or any other' medium used to store information pertaining to interstate or foreign commerce; all machinery, equipment, or transmitting devices used or capable of being used to send via interstate or foreign commerce: sounds, signals, pictures, or writings transmitted by wire for the purpose of executing such- scheme or artifice.
Id. at 1033. Comparing the Maxwell warrant to the one at issue in this case, I see no discernable reason why one falls within the good faith exception and the other does not. If anything, the warrant at issue in this case is much narrower. While the Maxwell warrant essentially allowed police to seize “all or virtually all of [the defendant’s] business records and equipment,” id., the warrant in this case is essentially limited to any electronic devices owned or likely to be used by Griffith and capable of electronically communicating or storing information and any documents relating to the Briscoe murder, see App’x 36.
Moreover, the warrant in this case did not authorize a general search of all of Griffith’s, records and the files contained within any electronic devices discovered. On its face, the warrant only authorized the seizure of the electronic devices, not a search of their content. As explained by the government both in its brief and at oral argument, an additional search warrant was required in order for law enforcement officers to search within these devices. Gov’t. Br. 29-30 & n.15; Oral Arg. Rec. at 24:40-25:02. These additional protections show that the officers here were operating in the real, tech-sawy world and doing their best to adapt available tools to act within the law, all while investigating an unsolved murder for which they had few leads prior to connecting Griffith to the car captured on videotape leaving the scene of the crime. While this Court seems unconcerned with handcuffing the ability of police to investigate crimes, our precedent emphasizes that our probable cause analysis should reflect a proper “concern[ ] with [the] realities of administration of criminal justice.” United States v. Vaughn, 830 F.2d 1185, 1186 (D.C. Cir. 1987).
Equally troubling is the Court’s willingness to cast aside the vital role an officer’s training and experience play in establishing probable cause -and good faith. The affiant in this case had 22 .years of experience working as a law enforcement officer and had spent 10 of those years specializing in gang-related murders. An officer with these credentials should be entitled to some deference or, at a minimum, not to have his reliance on his training and extensive experience maligned as wholly unreasonable. However, this is precisely what the Court has done, despite the fact we have repeatedly held an officer’s training and experience can play a vital role in establishing probable cause. See United States v. Cardoza, 713 F.3d 656, 661 (D.C. *1287 Cir. 2013) (finding an officer’s knowledge based on his training and experience reinforced finding probable canse); United States v. Johnson, 437 F.3d 69, 72 (D.C. Cir. 2006) (finding an affidavit based largely on the affiant’s professional experience to be sufficient to establish probable cause); United States v. Thomas, 989 F.2d 1252, 1254-55 (D.C. Cir. 1993) (same).
Recognition of the realities of criminal investigations and common sense seem conspicuously absent from the Court’s approach, Relying on a series of nonsequi-turs, the Court creates a world in which it is unreasonable to assume Griffith’s behavior will be similar to 90% of the adult population (i.e. he will have access to one or more cell phones); inconceivable that recent hot leads in a stale murder investigation might engender conversation among gang members who were likely involved in the killing; and risible to think leads relating to criminal activity might be found in the call history, texts, or e-mail of several phones to which Griffith had access, rather than only on a phone- for which he is the listed subscriber. Oddly, the Court does think the warrant establishes probable cause to arrest Griffith and subject him to a search incident to arrest and an inventory booking search, although the same facts are not sufficient to sustain a search warrant or to demonstrate good faith on the part of the officers.
The facts of this case illustrate precisely why the good faith exception is so vital to our Fourth Amendment jurisprudence. As the Court acknowledges, there is no indication of bad faith or recklessness on the part of these officers. They were diligently trying to build their case, relying on the limited—but promising—evidence available to them. Their investigation into the Briscoe murder—a crime that had occurred over a year before they sought the warrant to search Griffith’s apartment— had reached a lull until they discovered Griffith’s car and connected it-to him. Once they made this connection, they did not act rashly or hastily by attempting to coerce a confession out of Griffith but instead approached their investigation in a methodical and deliberate manner in order to discover the truth. They collected evidence by interviewing Griffith’s mother and reviewing his jailhouse calls. After coming to the conclusion that Griffith was probably involved in the Briscoe murder and that their recent investigatory progress might trigger a desire to communicate with the other suspects, they sought, a warrant to obtain any devices which might contain incriminating statements, from Griffith or other leads. - Thereafter, they planned to obtain yet another warrant to authorize them to search any electronic devices they seized. Nothing in the facts suggest they sought to deceive the magistrate or that they did anything other than present the limited evidence they had in hopes that it would establish probable cause. Once the magistrate held their evidence sufficient, they ■ relied upon that determination to search the apartment, and they did so in a way that' complied with the law—i.e. knocking and announcing before entering and limiting their search to the confines of the warrant. The search confirmed, their instincts were good. They recovered six cell phones and an electronic tablet—certainly an atypical number of phones for a household consisting of two adults. In the process of conducting the search, they discovered Griffith was guilty of another crime: unlawfully possessing a firearm.
II.
And that is perhaps the most troubling part of this case at the end of the day. There is no doubt that Griffith is guilty of the crime for which he has been convicted. By suppressing the gun Griffith unlawfully *1288 possessed, the Court is going to “offend[ ] basic concepts of the criminal justice system” by allowing a “guilty and possibly dangerous defendant] go free.” Herring, 555 U.S. at 141, 129 S.Ct. 695. And they are allowing this to happen not because the police intentionally violated the law or acted in a highly-culpable manner, but rather because the police relied upon a neutral and detached magistrate who determined probable cause existed. This result is directly contrary to the purpose of the exclusionary rule and Supreme Court precedent that reserves suppression only for the most serious police misconduct. If courts are going to impose a remedy as extreme as excluding evidence that is probative, reliable, and often determinative of a defendant’s guilt, we have a duty to protect officers who are doing their best to stay within the bounds of our ever-evolving jurisprudence. We live in a society where virtually every action an officer takes is now being heavily-scrutinized. Thus, the need for vindication when law enforcement officers behave in an exemplary fashion is more critical than ever. Unfortunately, the officers in this ease are not going to get the vindication they deserve. Furthermore, I have no doubt this case will be used in future cases to further undermine the good faith exception until either this Court sitting en banc or the Supreme Court steps in to cure today’s grievous error. Accordingly, I respectfully dissent.

. The Court contends its result is “the same” as Groh v. Ramirez, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), where, the Court claims, "[t]he Supreme Court ... found Leon's objective standard unmet notwithstanding the absence of any reason to suppose that officers acted in bad faith in relying on an invalid warrant.” Maj. Op. at 1279. But Groh cited Leon to hold “the warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law.” See 540 U.S. at 558, 124 S.Ct. 1284. Moreover, the Court’s pin cites to Groh include the Supreme Court explaining .why “no reasonable officer cpuld believe” the warrant at issue wás constitutionally sound. See id. at 564-65, 124 S.Ct. 1284. When the Court relies on a case where an officer is found plainly incompetent—the standard for piercing his qualified immunity—how can the Court credibly claim it is not passing judgment on the officers relying on the warrant here? See Maj. Op. at 1279.

. At numerous points during his jailhouse calls, Griffith begins discussing the murder and the investigation but quickly changes the subject so as to avoid making any incriminating statements.