J-A28014-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| BROOKE M. BARAN | : | |
| | : | |
| Appellant | : | No. 249 MDA 2025 |

Appeal from the Judgment of Sentence Entered January 30, 2025
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s): CP-40-CR-0003396-2022

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: APRIL 27, 2026**

Brooke M. Baran appeals from the judgment of sentence, imposing five to ten years' incarceration, after the trial court convicted her of possessing a firearm while being a convicted felon and related offenses.[1]  Because the Pennsylvania State Police lacked reasonable suspicion to extend a traffic stop of Baran's car for over an hour, we reverse.

On July 15, 2022, around 9:30 p.m., Baran was fueling her car at a gas station in Luzerne County.  A Pennsylvania State Police trooper, who was also at the gas station, saw that Baran's car had tinted windows.  He ran her license plate through his in-vehicle computer system and learned that Baran had "a criminal history for . . . drugs and guns."  N.T., 11/7/22, at 24.  When she left the gas station, he followed her.

---

[1] **See** 18 Pa.C.S.A. §§ 6105(a)(1) and 6106(a)(1); **see also** 35 P.S. §§ 780-113(a)(16), (32).

Soon thereafter, the trooper activated his lights and siren to stop Baran for driving with tinted windows. The trooper's dashboard camera recorded the incident. **See** Commonwealth's Suppression Ex. 1. Baran pulled into the parking lot of a Dollar General. The trooper parked behind her and walked up to Baran's passenger-side window.

He forgot his microphone in the cruiser, so there was no audio recording of their initial conversation. **See id.** at 2:38-7:49. Baran handed her driver's license to the trooper. While she "was trying to find the registration and insurance, [he] observed, in plain view, an orange pill bottle . . . inside [her] purse located in the vehicle." N.T., 11/7/22, at 8. There was also a pack of cigarettes with "a foreign object other than a cigarette inside of it." **Id.** The car contained "multiple air fresheners, which [are] commonly used to mask the odor of a controlled substance," as well as "a torch-style lighter . . . which is also commonly used for [lighting] a controlled substance." **Id.**

The trooper walked back to his cruiser and put on the microphone. **See id.** at 7:50-8:05. He returned to Baran's car and asked her name. She told him. The trooper then asked, "What's in the - - that, right there?" **Id.** at 8:18-21.

Baran answered, "Cigarettes." **Id.** at 8:21-22.

"Yeah, but there's something in it . . . What's that yellow there?" **Id.** at 8:23-27.

"It's a coupon. A coupon," Baran said. **Id.** at 8:27.

The trooper said, "Okay," and ordered her to get out of her vehicle. *Id.* at 8:28-42. She complied. Baran limped slowly to the front of his cruiser, because she had recently injured her leg in a motorcycle accident.

The trooper asked Baran what medicines she was taking and about the pill bottle he saw in her purse. *See id.* at 9:54-58. She said the pills had belonged to her late father, but her doctor told her that she could take them. The trooper said she was not allowed to take her father's medication without a prescription. Baran said, "But I take ibuprofen, ummm . . . I took an antibiotic today - - and prescribed Xanax, but I don't have them with me." *Id.* at 10:54-11:00.

"When's the last time you took Xanax?" he asked. *Id.* at 11:01.

"Oh my God! Yesterday. I take one a day." *Id.* at 11:02-05.

Next, the trooper held his flashlight above his head, pointed it down at Baran's face, and said, "I'm not gonna shine this light directly in your eyes, okay? I just wanna to see - - You can look straight at me . . . because, when I'm talking with you and when I put the light on you, your eyes are very dilated. They're very big." *Id.* at 11:06-18.

Baran asked, "What's that mean?" *Id.* at 11:18.

"So . . . most commonly, it's a sign of impairment of methamphetamine . . . When's the last time you used methamphetamine?" *Id.* at 11:19-29.

He then questioned her extensively about her criminal history. Initially, Baran answered him, but she began to get frustrated with the encounter. She then started walking back to her car to get a cigarette lighter and said, "My

leg is swollen up.  Okay, that's it.  I'm going home, I'm taking ibuprofen, and I'm putting ice on it."  *Id.* at 12:24-33.  She reached into her car and pulled out the lighter.

The trooper said, "That's a heck of a torch just for cigarettes."  *Id.* at 12:34-38.

"Yeah, that's because everyone steals my regular lighters.  I have one! I have one right here, that actually nobody takes," Baran replied and sat down in her driver's seat.  *Id.* at 12:39-45.

The trooper then answered his phone and confirmed with the caller that another unit would be arriving soon.  *See id.* at 12:46-13:05.  Once he was off the phone, Baran asked him why another unit was coming.

The trooper said, "Well, I've seen multiple indicators of criminal activity, and I just want to make sure that you're telling me the truth that there's no controlled substances inside the vehicle.  Is there any of those listed items? . . . Is there any firearm, or anything like that?  Rocket launchers?  Anything? I ask everybody the same questions.  Is there any guns?"  *Id.* at 13:15-39.

Baran exited her car and shut the door.  Leaning on the car, she said, "No.  I'm not allowed to have a gun; I'm a felon."  *Id.* at 13:40-44.

"What was your felony?"  *Id.* at 13:46-47.

"Selling guns."  *Id.* at 13:48.

The trooper again asked if she had any of the illegal items in her car. Baran said, to her knowledge, there were none of those things in the vehicle. However, she had recently cleaned out someone's house for them, so not

- 4 -

everything in the car belonged to her. Baran then admitted that the car contained a methamphetamine pipe. *See id.* at 14:55-59. At that point, the trooper asked for permission to search her vehicle for the pipe and "any of those listed items." *Id.* at 15:24.

"What listed items?" she asked. *Id.* at 15:25-26.

". . . we went over firearms. [Cannabis], methamphetamine, cocaine, heroin, fentanyl, any other controlled substances, or any amount of U.S. currency above $10,000." *Id.* at 15:27-38. She denied consent. *See id.* at 15:57. The trooper told her that he was going to call for a canine officer. *See id.* at 15:58-16:16. "If the canine alerts to the exterior . . . [it] will give me probable cause to search the vehicle." *Id.* at 16:27-39.

Next, three more troopers drove into the parking lot. *See id.* at 18:15. Seven minutes later, at 9:50 p.m., approximately 15 minutes after the trooper first stopped Baran, he radioed for a canine officer. *See id.* at 18:22-25; *see also* N.T., 11/7/22, at 41. The four troopers and Baran waited for another 46 minutes for Canine Officer Molly to arrive. **See** Commonwealth's Suppression Ex. 1 at 1:40:25; *see also* N.T., 11/7/22, at 42. From the moment Baran first pulled into the Dollar General's parking lot, "she was not free to leave." N.T., 11/7/22, at 46.

Canine Officer Molly's partner walked her around Baran's car twice. **See** Commonwealth's Suppression Ex. 1 at 1:06:08-1:07:10. Molly's partner told the trooper and Baran that she "alerted at the driver door and . . . alerted and indicated at the passenger door . . . ." *Id.* at 1:08:10-31.

Baran asked, "So, what does that mean?" *Id.* at 1:08:32.

"That means the trooper has probable cause," Molly's partner said. *Id.* at 1:08:33-35.

The investigating trooper again sought consent to search the vehicle at 10:40 p.m. *See* N.T., 11/7/22, at 42. He informed Baran that, if she did not consent, the State Police would tow her car to the impound for the weekend, until he could apply for a search warrant on Monday morning. Baran gave the trooper consent to search the vehicle. *See* Commonwealth's Suppression Ex. 1 at 1:10:40.

The troopers searched the vehicle. They found the methamphetamine pipe, the pill bottle with 30 pills of Oxycodone, and a pink and black handgun in the trunk. Specifically, Baran was transporting a Taurus .22 caliber pistol, loaded with seven bullets. The trooper handcuffed Baran, advised her of her *Miranda* rights,[2] and took her to jail. The Commonwealth charged Baran with possession of a firearm while prohibited, carrying a firearm without a license, possession of a controlled substance, and possession of drug paraphernalia.

On November 7, 2022, the magisterial district court held a preliminary hearing, where the investigating trooper testified. The court found probable cause to hold all the charges over for trial.

In the court of common pleas, Baran moved to suppress the evidence and her statements to the troopers. She claimed that, when the investigating

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

trooper ordered her to exit her vehicle, he "did not have reasonable suspicion to believe criminal activity was afoot . . . ." Baran's Motion to Suppress Evidence at 2. In her view, "an interrogation took place as to what she may have had on her or in her car, without [her] being Mirandized and without probable cause . . . whereby fruits of that search should be suppressed for violating [her federal and state] constitutional rights . . . ." *Id.*

On June 16, 2023, rather than conducting a suppression hearing, "the parties stipulated to the admission of the video . . . and the transcript of the preliminary hearing" from the magisterial district court. Findings of Fact and Conclusions of Law, 6/27/23, at 1.

The court denied the motion to suppress, because it ruled Baran was not in custody or subject to a custodial interrogation when the trooper ordered her to exit her vehicle. *See id.* at 5. The court therefore opined that she was not entitled to *Miranda* warnings. Notably, the court did not consider whether the trooper unreasonably exceeded the time frame needed to complete a traffic stop for tinted windows.

The suppression court also held that the trooper had "reasonable suspicion to justify the canine sniff" of Baran's car. *Id.* at 7. Because Canine Officer Molly indicated to the troopers that she smelled illicit drugs in the car, the court concluded there was probable cause to search Baran's vehicle, and all evidence therein was constitutionally seized.

The matter proceeded to a bench trial. The video was admitted into evidence. Also, the Commonwealth offered the Taurus .22 caliber pistol and its seven bullets, which the trial court admitted.

The trooper explained that the gun was "a break-barrel pistol." N.T., 5/29/24, at 40. He held up the gun, so the court could see it. **See id.** Baran did not ask the trial court to examine or hold the gun, nor did she admit evidence showing that the gun was inoperable.

As a result, the Commonwealth contended at closing arguments that it did "not need to show evidence of operability unless there [was] evidence of inoperability introduced; and none has been presented here . . . The trooper testified that it was loaded, there was a bullet in the chamber, and it was presented to the court to see that it appears to be operable." **Id.** at 80.

The court convicted Baran of all charges and sentenced her as described above. This timely appeal followed.

She raises two issues that we have reordered[3] as follows:

1. Whether the [trial] court erred in . . . finding Baran guilty [of two firearm-possession charges] after the Commonwealth failed to introduce evidence that the [gun] . . . was a "firearm" as defined under Title 18 . . . ?

2. Whether the [suppression] court erred in denying Baran's motion to suppress evidence, [because the trooper] unreasonably detained Baron for [nearly] one hour [after the traffic stop ended,] without reasonable

_____

[3] "Because a successful sufficiency-of-the-evidence claim warrants discharge on the pertinent crime, we must address this issue first." **Commonwealth v. Toritto,** 67 A.3d 29, 33 (Pa. Super. 2013).

- 8 -

suspicion to suspect criminal activity was afoot . . .
and subjected her to custodial interrogation . . . ?

Baran's Brief at 5-6.

In her first issue, Baran claims the trial court erroneously convicted her of possessing a firearm while being prohibited from doing so and of carrying a firearm without a license. *See id.* at 42. The parties agree that, for the Commonwealth to win convictions on those two charges, it must prove that a defendant possessed a "firearm," under 18 Pa.C.S.A. § 6102. *See* Baran's Brief at 43 and Commonwealth's Brief at 17-18. They disagree over whether the Commonwealth offered such proof.

Baran argues that the trial court merely observed the gun but did not physically touch it. *See* Baran's Brief at 44. Additionally, she suggests the trial court relied "on facts not introduced into evidence," in its Rule 1925(a) Opinion, when it found that the gun "was designed to expel the ammunition [found inside of it,] and its length was significantly less than 15 inches." *Id.* (quoting Trial Court Opinion, 4/17/25, at 7). Baran faults the Commonwealth for offering "no testimony that the alleged firearm had been discharged . . . ." *Id.* at 45. She therefore insists there is no evidence to show that the gun was operable, and she believes her two firearm-possession convictions must be overturned.

"A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013). "When reviewing a sufficiency claim, [we] view the evidence in the light most

favorable to the [Commonwealth,] giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Id.*

To constitute a "firearm," the gun must be a "pistol or revolver with a barrel length less than 15 inches . . . ." 18 Pa.C.S.A. § 6102. At trial, the trooper testified that the gun found in the trunk of Baran's car was a pistol. *See* N.T., 5/29/24, at 40. The trial court observed the pistol and made a factual finding that "its length was significantly less than 15 inches." Trial Court Opinion, 4/17/25, at 7.

Baran has not made the pistol a part of the certified record. Nor has she provided us with a picture of the pistol next to a ruler.

The certified record must include the "original papers *and exhibits* filed in the lower court . . . ." Pa.R.A.P. 1921 (emphasis added). The "responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains *all of the materials* necessary for the reviewing court to perform its duty." *Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (emphasis added).

If Baran had perfected the record by providing us with all of the trial exhibits, we could determine whether the size of the pistol supports the factual finding that it was short enough to be a "firearm" under Section 6102.[4] Thus, similar to the way in which she neglected to ask the trial court to measure the

---

[4] In many cases, we would not need (or want) the physical evidence in this Court; a photograph of the evidence next to a ruler or other item for point of reference to indicate its size would suffice. But Baran has provided us with no photographs of the Commonwealth's evidence.

pistol at trial, Baran has made it impossible for this Court to do so on appeal. Presumably, this is because she knows that, if we could actually measure the pistol, it would be less than 15 inches long. In other words, the missing exhibit would likely prove Baran's guilt beyond a reasonable doubt.

Nevertheless, without the pistol (or, at least, a picture of it next to a ruler), nothing in the record contradicts the factual finding of the trial court that the pistol was less than 15 inches long. Accordingly, we cannot hold that the trial court's finding of fact that it was "significantly less than 15 inches" lacks support in the evidence of record, because Baran did not provide us with the at-issue exhibit. Trial Court Opinion, 4/17/25, at 7. With nothing of record to undermine the finding of fact regarding pistol length, we are bound by the determination of the fact finder. Thus, based on the trial court's finding that the Commonwealth's exhibit was less than 15 inches in length, we conclude that the Commonwealth offered sufficient evidence that the pistol was a "firearm" under 18 Pa.C.S.A. § 6102.

Baran's other sufficiency argument – namely, that the Commonwealth failed to prove that the firearm was operable – rests upon a misunderstanding of Pennsylvania law. As the Commonwealth correctly observed during closing arguments, the prosecution "is not required to prove that the gun that the defendant possessed was operable, unless evidence has been introduced that the gun was inoperable." *Commonwealth v. Mead*, 326 A.3d 1006, 1013 (Pa. Super. 2024), *appeal denied*, 343 A.3d 985 (Pa. 2025). "No evidence was introduced at [Baran's] trial that the [Taurus] pistol was incapable of firing

ammunition. Accordingly, the Commonwealth was not required to introduce any evidence that [it] was operable . . . ." *Id.*

Hence, we dismiss Baran's first appellate issue as meritless.

As her second issue, Baran contends that the suppression court should have suppressed the physical evidence against her and the statements she made to the troopers. Baran sets forth several arguments to support her claim.

First, she contends that law enforcement may not access the criminal records of a vehicle owner prior to stopping the vehicle. *See* Baran's Brief at 18-25. In her view, the trooper's pre-traffic-stop record check was "an illegal search [of her criminal history] under the United States and Pennsylvania Constitutions, and her resulting convictions should be overturned." *Id.* at 25.

Second, Baran assumes that, due to the criminal history that the trooper obtained from the Pennsylvania State Police's computer system, he "decided to stop the . . . traffic stop and change the reason for the stop into a drug, money, and gun investigation, prior to asking [her] to step out of the vehicle." *Id.* at 26-27. Thus, in her mind, "what was presumed to be a valid traffic stop could have actually been a pretextual stop based on Baran's prior criminal felony record." *Id.* at 27. She suggests that this "Court should conclude that any statements made once Baran exited the vehicle, and her consent to search following the [canine-]sniff search one hour later, was an illegal search and seizure under the Fourth Amendment." *Id.* at 27-28.

Third, she argues that the trooper's knowledge of her criminal history, observation of the orange pill bottle, the multiple air fresheners, the torch lighter, and the cigarette pack with the coupon in it "did not give rise to reasonable suspicion that criminal activity was afoot." *Id.* at 28. Thus, she claims that the trooper could not unreasonably extend her traffic stop for over an hour, and all of the evidence and her statements made after she was ordered to exit her car must be suppressed.

Fourth, Baran suggests that, by the time that the trooper asked her to step outside of her vehicle, "the traffic stop had already evolved into a detention for investigation of a separate crime." *Id.* at 35. At that point, the trooper "questioned Baran and detained her, without giving her *Miranda* warnings, for an inordinately long period of time, while [she] was in pain, still recovering from injuries to her legs from a motor vehicle accident three days prior." *Id.* Given that three other uniformed troopers and a canine officer entered the scene, she contends that the questioning became prolonged and coercive "as to approximate the atmosphere of a station-house interrogation." *Id.* at 39-40. She thus believes that she "should have been Mirandized prior to [the trooper] asking her to consent to a search of her vehicle." *Id.* at 40.

Lastly, Baran contends that she did not voluntarily consent to the search of her vehicle. *See id.* at 40-42. Thus, "this Court should conclude that the search was illegal and [her] convictions should be overturned." *Id.* at 42.

We need only consider Baran's third argument, because it is dispositive. She claims the trooper lacked reasonable suspicion to detain her "after the

- 13 -

traffic stop, and any evidence obtained should have been suppressed . . . ." Baran's Brief at 33. In Baran's view, the trooper lacked reasonable suspicion to ask her to exit her vehicle and begin questioning her about whether there were any drugs or firearms inside the car.

Baran does not claim that she is entitled to heightened protections under the Constitution of the Commonwealth of Pennsylvania.[5] Thus, for purposes of this appeal, we must treat the protections contained in our state charter as coextensive with those found in the federal constitution. As a result, we apply federal constitutional law.

Where, as here, a trooper acts without first securing a warrant, the suppression court's "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." ***Ornelas v. United States***, 517 U.S. 690, 699, (1996). That said, "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." ***Id.***

Under the Constitution of the United States, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and

---

[5] ***See Commonwealth v. Edmunds***, 586 A.2d 887 (Pa. 1991) (holding that the Constitution of the Commonwealth of Pennsylvania may, in certain cases, provide a party with greater rights than Constitution of the United States and laying out the test to determine if those greater rights exist).

seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250, (1991) (citing *Katz v. United States,* 389 U.S. 347 (1967), and *Illinois v. Rodriguez,* 497 U.S. 177 (1990)). Accordingly, the Supreme Court of the United States has "long approved consensual searches, because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* at 250–51.

In this case, Baran gave consent to search her vehicle. However, she claims her consent was invalid, because it was the fruit of an unconstitutional seizure of her person.

If Baran was "seized" when the trooper "asked questions of her, [the trooper's] conduct in doing so was constitutional only if [he] reasonably suspected [Baran] of wrongdoing." *United States v. Mendenhall*, 446 U.S. 544, 552 (1980). "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

At the preliminary hearing, the trooper admitted that, from the time he pulled Baran over in the Dollar General parking lot, "she was not free to leave." N.T., 11/7/22, at 46. Thus, she was "seized" for Fourth Amendment purposes, and the trooper's interrogation of her in the parking lot "was constitutional only if [he] reasonably suspected [Baran] of wrongdoing," under *Terry*, *supra*. *Mendenhall*, 446 U.S. at 552.

Baran and the Commonwealth agreed that the trooper had probable cause to seize her to conduct a traffic stop for tinted windows and to write her a citation for that offense. They also agree that the trooper detained Baran for over an hour before she consented to the search of her vehicle. **See** Commonwealth's Brief at 5-8 (citing Commonwealth's Suppression Ex. 1 from 2:40 to 1:10:42). Thus, the question is whether an hour-long, warrantless seizure of a person is reasonable to conduct a traffic stop under the Fourth Amendment. It is not.

The Supreme Court of the United States has held that a traffic "stop exceeding the time needed to handle the matter for which the stop was made violates the constitution's shield against unreasonable seizures." **Rodriguez v. United States**, 575 U.S. 348, 350 (2015).[6] In other words, a constitutional traffic stop becomes unconstitutional if law enforcement "prolonged [it] beyond the time reasonably required to complete the mission of **issuing a ticket** for the violation." **Id.** at 350–51 (emphasis added).

In **Rodriguez**, a police officer saw a vehicle drive on the shoulder of a Nebraska highway. At 12:06 a.m., the officer stopped the vehicle for that summary offense and asked Rodriguez for his license, registration, and proof of insurance. The officer walked back to his vehicle and completed a records

---

[6] Curiously, the Commonwealth omits **Rodriguez v. United States**, 575 U.S. 348 (2015), from its appellate brief, even though the facts of **Rodriguez** and this case are nearly identical. **See** Commonwealth's Brief at 15. As we explain below, the delay here was far more egregious than the delay in **Rodriquez**. The Commonwealth's inability to confront, much less distinguish, **Rodriquez** is telling.

check on Rodriguez. He then returned to Rodriguez's vehicle and asked the passenger, Scott Pollman, where they were coming from. Mr. Pollman said they were returning from Omaha, where they had looked at a car that was for sale. The officer did a records check on Mr. Pollman and called for backup.

Twenty-two minutes later, the officer issued Rodriguez a written warning and asked him for permission to walk his police dog around the vehicle. Rodriguez refused. The officer then instructed Rodriguez to exit the vehicle and wait in front of his patrol car until a deputy sheriff arrived.

The deputy got there at 12:33 a.m., and the officer and his canine walked around Rodriguez's car. Seven or eight minutes after the officer had issued the written warning, the dog indicated that drugs were in the vehicle. Based on the dog's alert, the officers searched the vehicle. They found a large bag of methamphetamine, and a federal grand jury indicted Rodriguez on the charge of possession with intent to deliver.

Rodriguez "moved to suppress the evidence seized from his car on the ground, among others, that [the officer] had prolonged the traffic stop without reasonable suspicion in order to conduct the dog sniff." *Id.* at 352. The district court denied the motion to suppress.

Following Rodriquez's conviction, he appealed to the United States Court of Appeals for the Eight Circuit, which affirmed. The appellate court held that the dog sniff did not unreasonably prolong the traffic stop, regardless of whether the officer lacked reasonable suspicion to continue to detain

- 17 -

Rodriguez. The court held that a delay of only seven to eight minutes for a dog sniff was reasonable.

The Supreme Court granted certiorari and vacated the decision of the Eighth Circuit. Writing for the High Court, Justice Ginsburg explained that a "relatively brief encounter, a routine traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest." *Id.* at 354 (some punctuation omitted). "Because addressing the infraction is the purpose of the [traffic] stop, it may last no longer than is necessary to effectuate that purpose." *Id.* Constitutional allowance "for the seizure thus ends when tasks tied to the traffic infraction are — or *reasonably should have been* — completed." *Id.* (emphasis added).

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." *Id.* at 355 (some punctuation omitted). These are "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* They do not, however, include detaining the driver for a "dog sniff, [*i.e.,*] a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (some punctuation omitted). In fact, "the Government acknowledged at oral argument that a dog sniff, unlike the routine measures just mentioned, is *not* an ordinary incident of a traffic stop." *Id.* at 355–56 (emphasis added). Such "on-scene investigation into other crimes . . . detours from [the] mission" of the original traffic stop. *Id.* at 356.

"If an officer can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission." *Id.* at 357 (some punctuation omitted). A "traffic stop prolonged beyond that point is unlawful." *Id.* In short, the Fourth Amendment bars an officer from unreasonably "prolong[ing] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355. Because the Eighth Circuit had not decided whether the officer had reasonable suspicion to detain Rodriguez beyond the time needed to complete the mission of the traffic stop, the Supreme Court vacated the order affirming the denial of suppression and remanded to the appellate court for consideration of that question.[7]

In this case, the 46-minute delay from the time that the trooper called for a canine officer is far worse than seven or eight minutes that the police delayed Rodriquez. Here, the trooper's initial interaction with Baran lasted about five minutes. *See* Commonwealth's Suppression Ex. 1 at 2:38-7:49.

The trooper returned to his cruiser, during which time he "reasonably should have been [able to] complete[]" the traffic stop. *Rodriguez* at 354.

_____

[7] On remand, the Eighth Circuit declined to address the issue that the Supreme Court directed it to consider. *See United States v. Rodriguez*, 799 F.3d 1222, 1223 (8th Cir. 2015). Instead, the appellate court affirmed the order denying suppression on the basis that, under *Davis v. United States*, 564 U.S. 229 (2011), the officer justifiably relied upon the precedent of the Eighth Circuit existing at the time of the traffic stop that a dog-sniff search was a *de minimis* delay of the stop. As a result, even though the officer had accidentally violated Rodriguez's Fourth Amendment rights, the evidence was not subject to the exclusionary rule, because suppressing the evidence would have served no deterrent upon future police conduct.

The trooper had more than ample time to write Baran a citation for tinted windows and allow her to drive home. However, he squandered the window of time that the Fourth Amendment permitted him to seize Baran's person to perform his mission of a traffic stop.

Instead, he returned to Baran's car and began questioning her about the contents of her cigarette pack. The contents of Baran's cigarette pack had no relevance to the tint in her windows. Thus, it was a line of inquiry beyond the scope of the trooper's original traffic stop.

Therefore, we hold that, as a matter of constitutional law, the trooper commenced an "on-scene investigation into other crimes [and] detour[ed] from [the] mission" of the traffic stop. *Id.* at 356. Accordingly, the trooper still had Baran seized, but the interaction was no longer a traffic stop supported by probable cause of tinted windows. Instead, the event morphed into "a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* at 355.

To detain Baran in the parking lot any longer, the trooper needed to justify his ongoing seizure of her with "the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* He needed to support a *Terry* stop of Baran, separate and apart from the probable cause he originally used to initiate the traffic stop.

In *Terry*, the Supreme Court held that, under the Fourth Amendment, an officer may conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. *See Terry*,

392 U.S. at 30. Reasonable suspicion "requires at least a minimal level of objective justification for" seizing the person to investigate criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id.* at 123–24 (some punctuation omitted).

Here, the trooper had no particularized suspicion of ongoing criminal activity when he decided to extend the traffic stop for a criminal investigation into the contents of Baran's vehicle. Instead, all he knew was that she had an orange pill bottle in her purse, multiple air fresheners in her car, as well as a torch-style lighter in her car. Indeed, when the trooper converted the traffic stop into a drugs-and-guns investigation, he did not even know that Baran's eyes were dilated, because he did not observe that indicator of possible drug use until *after* he had directed her to exit the vehicle. *See* Commonwealth's Suppression Ex. 1 at 11:06-18.

In fact, he could not even rely upon his suspicion that Baran may have been hiding drugs in her cigarette pack, because he asked what was inside of it, and she said, "It's a coupon. A coupon." *Id.* at 8:27. Therefore, whatever weight that object may have had in the reasonable-suspicion calculus was quickly annulled. The cigarette pack's trail of suspicion had run cold. Thus, while the suppression court's factual finding that a "pack of cigarettes containing a foreign object other than a cigarette was also observed by" the trooper is technically correct, the court neglected to find that the "foreign object" therein was not illegal. Findings of Fact and Conclusions of Law at 2.

As a result, the trooper's and the suppression court's reliance upon that object to develop reasonable suspicion of criminal activity was misplaced.

In short, the trooper did not see anything illegal in the vehicle. Also, he did not testify to smelling anything suspicious when interacting with Baran. Nor did she confess to possessing anything illegal until after the trooper unreasonably extended the traffic stop to conduct a criminal investigation. The trooper merely had a hunch, based on Baran's prior convictions for drugs and guns, that she may have been repeating her prior crimes. This is not the reasonable suspicion that **Terry** demands to detain a person. We hold that seeing three legal items in a vehicle, without more, does not give a trooper reasonable suspicion that crime may be afoot, even if those legal items might, in some instances, be used in conjunction with illicit drugs.

Under **Rodriguez**, **supra**, the trooper unreasonably extended the traffic stop by over 45 minutes. He therefore violated Baran's Fourth Amendment right to be free from an unreasonable seizure of her person. The evidence that the troopers obtained following the unreasonable seizure of Baran – *i.e.*, the statements she made when outside of her vehicle, Canine Officer Molly's alerts, the methamphetamine pipe, the orange pill bottle and its contents, and the firearm – must be suppressed. They are all the fruits of a poisonous tree. **See Wong Sun v. United States**, 371 U.S. 471 (1963).

Baran's second issue entitles her to complete appellate relief. Hence, we dismiss her additional arguments on this issue (concerning the trooper's record check into her criminal history, the alleged pretextual nature of the

traffic stop, the timing of the *Miranda* warnings, and the alleged coercion of her consent to search) as moot.

Judgment of sentence and convictions vacated.  Order denying motion to suppress reversed.  Case remanded for further proceedings consistent with this decision.

Jurisdiction relinquished.

Judge Lane joins this decision.  Judge McLaughlin concurs in result.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>04/27/2026</u>